(Confidentiality Agmt. Background.) The Confidentiality Agreement defined "Proprietary Information" as:
(a) all technology, know how, plans, designs, specifications, formulas, technical information, drawings, and other information related to the Company's products, production equipment, and manufacturing processes,
(b) audited and internally prepared financial statements and related supplementary information, and other financial information of the Company which may include information about revenue, expenses, prices, and profits, and
(c) all other information owned by or related to the Company which is not generally known within the industry in which the Company is engaged.
(Confidentiality Agmt. § 1.)
Under Section 2 of the Agreement, Downey agreed: (a) to treat Proprietary Information as "secret and confidential"; (b) to use Proprietary Information only for Ecore's benefit and not for his own benefit; (c) to not directly or indirectly disclose or communicate any Proprietary Information to anyone except as authorized by Ecore; and (d) to promptly return to Ecore all Proprietary Information, without retaining any copies, summaries, or excerpts, upon termination of his employment. (Id. § 2.) The Confidentiality Agreement also declared Ecore's "exclusive rights" to intellectual property relating to its Proprietary Information, stating:
All inventions or discoveries which relate to the Proprietary Information shall be the exclusive property of the Company. Whenever requested by the Company, either during or subsequent to employment, Employee shall execute such instruments as Company deems necessary for the purpose of confirming Company's exclusive rights to any such invention or discovery under applicable intellectual property law, including but not limited to any application for Letters patent and assignments thereof.
(Id. § 4.) The Agreement further provided that its terms "shall apply during and after the Employee's employment with Employer."[15] (Id. § 5.) According to Dodge, confidentiality and intellectual property protections were an essential prerequisite to Ecore's willingness to work with Downey. Dodge testified:
Downey was retained by Ecore having worked for a competitor. One of the initial conversations I had with [Downey] was under no circumstances would *472 we consider extending any relationship or employment or any other relationship with [Downey] unless he entered into a confidentiality and intellectual property protection and assignment agreement. That was absolutely sacred. We would never have hired somebody from a direct competitor and allowed them to pursue any alternative lines of business. It would have been foolhardy, foolish, never would have done it.
(Dodge 8/22/16 Dep. 89-90.) Downey has acknowledged that he agreed to the provisions of the Confidentiality Agreement. (Downey 8/29/16 Dep. 118-119.)
In 2008, Ecore asked Downey to sign an "Amended and Restated Confidentiality Agreement" that sought to: (1) refer to Downey as a "Key Person" of the Consultant instead of an "Employee"; and (2) create joint and several obligations on the part of Downey and CSR. (Defs.' SJ Opp. 8, Ex. 2; Ont. Ct. App. Op. ¶ 24.) Downey declined to sign the amended agreement. (Downey 1/3/17 Decl. ¶ 3, ECF No. 91-2.)
3. The Disputed Intellectual Property
a. The Impact Sound Isolation Invention and Assignment
As noted above, Downey began working as Ecore's business development manager for industrial products in October 1999. (Downey 6/27/07 Dep. 64; Downey 8/29/16 Dep. 65, 70.)[16] In January 2000, Dodge told Downey that Ecore wanted to pursue business in the sound and vibration mitigation product market, and he asked Downey to investigate and develop opportunities in that market. (Downey 6/27/07 Dep. 84; Downey 8/29/16 Dep. 70.) To identify potential opportunities, Downey consulted with Ecore's engineers and decided to focus on flooring system products that could mitigate impact sound. (Downey 6/27/07 Dep. 87, 90-91.) At that time, Downey had no background in the sound and vibration flooring market, but he and Dodge knew that rubber was a good material with which to "build products ... that had sound and vibration qualities." (Downey 6/27/07 Dep. 85, 90.)
Downey considered the sound and vibration products already on the market and explored whether Ecore's existing rubber products might have a sound and vibration application. (Downey 8/29/16 Dep. 70-71; Downey 6/27/07 Dep. 106.) He examined Ecore products from its sample room and reviewed Ecore's formulas and specification sheets for its rubber products. (Downey 6/27/07 Dep. 87, 90-91; Downey 4/1/11 Dep. 22-23, 62; Downey 4/24/08 Dep. 217, Pl.'s SJ Ex. I.)[17] Downey also consulted with employees of Ecore's joint venture partner, BSW, who informed him that the material used in Ecore's 6010 and 6510 formulations was "suitable for absorbing vibration." (Downey 4/1/11 Dep. 23.) BSW personnel also provided literature, including a binder, with test results and other information regarding the vibration isolation properties of the 6010 and 6510 formulations. (Id. at 22-27.)
Downey ultimately decided to modify Ecore's 6510-LC formulation so that it would be suitable for use as substrate between a subfloor and a decorative top floor covering, such as ceramic tile. (Downey 6/27/07 Dep. 106; Downey 4/1/11 Dep. 57, 62.) Downey asked Ecore employee Dierk Heinbach "to add some more regrind" to the 6510-LC formula in order to *473 make the product "slightly more porous for the adhesive" and to give it a "slightly higher dynamic stiffness."[18] (Downey 4/1/11 Dep. 57, 62, 73.) With this one modification, the resulting formulation - designated 6510-LC-2 - could be used as a flooring substrate that "could support the decorative floor covering and still perform acoustically." (Downey 4/1/11 Dep. 57, 73.) This new flooring system design became known as the Impact Sound Insulation ("ISI") invention.
On August 16, 2001, Ecore filed patent application No. 09/931,320 (the " '320 Application") for the ISI invention.[19] (Downey 11/29/16 Decl. ¶ 14; Defs.' SJ Opp. Ex. 4.) The '320 Application named Downey as its sole inventor. (Downey 11/29/16 Decl. ¶ 15.) On October 10, 2001, Downey executed an Assignment to Ecore of the ISI invention set forth in the '320 Application (the "Assignment").[20] Pursuant to the Assignment, Downey agreed to, inter alia :
1. Assign and convey to and confirm in the Assignee the entire right, title and interest in and to said inventions and discoveries, said ['320 Application], and any and all other applications for Letters Patent on said inventions and discoveries in whatsoever countries, including all divisional, renewal, substitute, continuation and Convention applications based in whole or in part upon said inventions or discoveries or upon said applications, and any and all Letters Patent and reissues and extensions of Letters Patent granted for said inventions and discoveries or upon said applications, and every priority right that is or may be predicated upon or arise from said inventions, said discoveries, said applications and said Letters Patent;
* * *
5. Bind my/our heirs and legal representatives, as well as myself/ourselves, to do, upon Assignee's request and at its expense, but without additional consideration to me/us or them, all acts reasonably serving to assure that the said inventions and discoveries, the said patent applications and the said Letters Patent shall be held and enjoyed by Assignee as fully and entirely as the same could have been held and enjoyed by me/us or my/our heirs or representatives if this assignment had not been made; and particularly to execute and deliver to Assignee all lawful application documents including petitions, specifications, and oaths, and all assignments, disclaimers, and lawful affidavits in form and substance as may be requested by Assignee; ...
(Assignment ¶¶ 1, 5.) In the Assignment, Downey acknowledged his receipt, and the sufficiency, of "valuable consideration" from Ecore for his execution of the Assignment.[21] (Assignment Pmbl.)
On July 26, 2005, the '320 Application issued as U.S. Patent No. 6,920,723 (the " '723 Patent").[22] The ISI invention detailed *474 in the '723 Patent comprises a flooring system and a substrate for use therein, wherein the flooring system has a subfloor and a decorative top layer. On July 25, 2007, Ecore filed an application to reissue the '723 Patent (the "Reissue Application"). (Defs.' SJ Ex. E.) At Ecore's request, Downey signed the inventor declaration required with the Reissue Application.[23] (Defs.' SJ Br. 11.) On November 23, 2010, the '723 Patent was reissued as Patent No. RE41,945 (the "Reissued Patent").[24] The ISI invention covered by the '723 and Reissue Patents is incorporated in Ecore's "QTscu" product line. (Downey 6/27/07 Dep. 65; Downey 8/29/16 Dep. 293-94.)
(b) The Noise and Vibration Mitigation Mat Invention and Patents
While working at Ecore, Downey developed a rubber product for use with concrete, which the parties refer to as the "QTrbm" product or the Noise and Vibration Mitigation Mat ("NVMM") invention. (Pl.'s SJ Br. 7; Downey 1/3/17 Decl. ¶ 26; Downey 8/29/16 Dep. 291.) Initially, Downey worked with Dodge and Ecore's counsel, Barley Snyder, LLC, to pursue a patent for the NVMM invention. (Pl.'s SJ Br. 7; Downey 8/29/16 Dep. 291-292.) On October 1, 2002, Ecore filed provisional patent application No. 60/415,054 (the " '054 Application") for the NVMM invention. (Downey 1/3/17 Decl. ¶ 25.) On October 1, 2003, Ecore filed patent application No. PCT/US03/31348 (the " '348 Application"), claiming priority to the '054 Application. (Id. ) On April 1, 2005, Ecore filed application No. 11/096,589 (the " '589 Application"), which was a continuation in part of the '348 Application. (Id. ) Subsequently, the '589 Application was abandoned. (Defs. SJ Ex. LL; Defs.' SJ Opp. Ex. 13.)
On September 1, 2011, through his own attorneys, Downey filed patent application No. 13/223,339 (the " '339 Application"), which was a continuation of the '589 Application for the NVMM invention. (Downey 1/3/17 Decl. ¶¶ 28-29; Defs.' SJ Ex. MM.) On July 24, 2012, Downey filed patent application No. 13/556,731 (the " '731 Application"), which was a continuation of the '339 Application. (Defs.' SJ Exs. D, LL.) On August, 14, 2012, the '339 Application issued as U.S. Patent No. 8,240,430 (the " '430 Patent"), and on October 15, 2013, the '731 Application issued as U.S. Patent No. 8, 556,029 (the " '029 Patent"). The '430 and '029 Patents are both titled "Noise and Vibration Mitigating Mat." (Defs.' SJ Exs. D, MM.)
Defendants contend that Ecore abandoned the NVMM invention patent applications, and that Dodge told Downey he could pursue patenting of the invention on his own. (Downey 8/29/16 Dep. 294-95; Downey 1/3/17 Decl. ¶¶ 25, 27.) According to Ecore, however, it did not abandon the NVMM invention and did not give Downey permission to pursue the related patents on his own behalf. (Dodge Decl. ¶¶ 5-6; Pl.'s SJ Opp. 5.) Ecore further asserts that it did not know the '029 Patent existed until Defendants disclosed it in their Answer and Counterclaims to Plaintiff's Amended Complaint in Case No. 11-6843. (Pl.'s SJ Opp. 5-6.)
4. Downey/CSR Compensation Disputes
The record indicates that from late 2000 through the end of the parties' business relationship, Downey and Dodge engaged in a number of communications and negotiations relating to the compensation issues *475 in dispute in the parties' summary judgment motions. These disputes involve: (1) Downey's claimed entitlement to compensation for the ISI invention and Assignment, and (2) CSR's claim for allegedly unpaid bonus compensation.
As noted above, the Consulting Agreement originally obligated Ecore to pay CSR $132,000 (CDN) per year, plus a $20,000 (CDN) bonus if Ecore realized $1 million (USD) in new revenue in fiscal year 2000, and an additional 2.5 percent of all revenue over $1 million (USD) in that year.[25] (Consulting Agmt. § 3(a), (c).) By early to mid December 2000, it was evident that Ecore would not realize $1 million (USD) in new revenue in 2000. (Pl.'s SJ Exs. M, O.) Nevertheless, by letter dated December 8, 2000, Dodge offered to pay CSR/Downey a bonus of $10,000 (CDN) for 2000. (Pl's SJ Ex. M.) Dodge also proposed a 4.5 percent increase in base compensation and a target bonus of $20,000 (CDN) for 2001. (Id. ) Downey counteroffered for a $15,000 (USD) bonus for 2000, plus an incentive bonus of 3.33 percent of new, profitable revenues in 2001, rather than the 2.5 percent over $1 million specified in the Consulting Agreement. (Pl.'s SJ Ex. N.) Ultimately, it appears that the parties agreed on a bonus of $10,000 (CDN) for 2000 and a modified incentive bonus of 6 percent of the gross margin on Ecore's sound and vibration-related revenues for 2001 and going forward. (Pl.'s SJ Ex. O.)
Defendants contend that in early October 2001, when Downey agreed to assign his rights in the '320 Application to Ecore, Dodge told Downey that, in return, Ecore would reasonably compensate him for the ISI invention and Assignment. (Downey 11/29/16 Decl. ¶ 16; Downey 8/29/16 Dep. 225-26.) Downey asserts that he "accepted [this] offer," which he claims resulted in an enforceable oral agreement (the "October 2001 'Agreement' ") under which Ecore was obligated to pay him "reasonable compensation" for the Assignment. (Id. ¶¶ 16-17; Downey 1/3/17 Decl. ¶¶ 8-12.) The alleged October 2001 "Agreement"-the existence of which is disputed-did not specify what would constitute "reasonable compensation," how that compensation would be calculated or determined, when the compensation was to be paid, or whether and to what extent Downey would share the costs of defending or enforcing the ISI invention patents. Defendants contend that the alleged October 2001 "Agreement" supersedes the Confidentiality Agreement and controls the Assignment of the ISI invention. (Defs.' SJ Opp. 26, 28, 33-34; Defs.' SJ Reply 5, 10-11, ECF No. 94.)
Ecore denies that any such agreement existed. Dodge testified that Ecore "never" agreed to compensate Downey for the Assignment (Dodge 8/22/16 Dep. 88.) According to Dodge, "[Ecore] had no duty or obligation to compensate Mr. Downey for something that he was legally obligated to do pursuant to his employment agreement." (Dodge 8/22/16 Dep. 88.) Dodge further testified that Downey "was compensated at the time he entered into his employment agreement.... The consideration he received was his salary and bonuses to that point in time." (Id. at 90.)
Downey claims that between October 2001 and the July 2005 issuance of the '723 Patent, Dodge repeatedly told him that Ecore would reasonably compensate him for the Assignment under the October 2001 "Agreement" as soon as the patent *476 was issued and could be successfully asserted by Ecore. (Downey 1/3/17 Decl. ¶¶ 14-15.) However, for most of that period, the parties' written communications contain no reference to the allegedly promised Assignment compensation. For example, on January 2, 2002, Dodge sent Downey an email confirming their agreement that "your bonus will continue to be based upon our current formula: namely, 6% of the gross margin for all identified sound and vibration customers.... This formula shall remain in effect for FY 2002-2004," (Pl.'s SJ Ex. P; Dodge 8/22/16 Dep. 63-64.) Similarly, between May and December 2004, Dodge and Downey exchanged correspondence regarding the CSR/Downey compensation and bonus calculation, and Downey indicated that he wished to enter into negotiations for a new consulting agreement between Ecore and CSR. (Pl.'s SJ Exs. S, T.) This correspondence contains no reference-by either Dodge or Downey-to compensation for the Assignment, generally, or to the alleged October 2001 "Agreement," specifically.
The record reflects that in early 2005, Dodge and Downey were negotiating the terms of future base and bonus compensation to be paid to CSR/Downey, and Downey was requesting compensation for the Assignment. However, the negotiations contain no express reference to the alleged October 2001 "Agreement." (Pl.'s SJ Ex. T.) In a May 2, 2005 letter to Dodge, Downey stated, inter alia :
My compensation was supposed to be designed to reflect additional remuneration for the impact sound patent I had assigned to DRI, which your proposal does not address.
* * *
Building upon these points, and on a basis that I wish to continue my relationship with DRI, any proposal for my future remuneration must reflect the fact that I am to be compensated for my development of the patent and inauguration of the [Sound & Vibration] Product line. I would propose that I be compensated on a percentage basis (exact amount to be agreed subsequent to negotiations) of the gross revenue based upon sales of the [ISI], the patent for which I had previously assigned to DRI, in consideration for that assignment from me.
(Id. )
The parties' negotiations continued in 2006, and in early May of that year, Dodge faxed Downey three proposed agreements: an Independent Contractor Agreement, a Special Commission Agreement, and a Confidential Information and Invention Assignment Agreement. (Id. ) Between May 5, 2006 and early November 2006, Downey and Dodge exchanged a series of emails regarding the terms of the proposed agreements, including the provisions relating to patents and intellectual property. (Id. ) In the first of three May 5 emails, Downey stated: "I have reviewed the proposed agreements you faxed to me. There is much work to be done and unfortunately not much time left in which to do it." (Id. ) Downey then proposed some revisions to the agreements, including to the terms of the "special commissions agreement ie. patent licensing agreement," which Downey said would apply to the ISI, NVMM, and other inventions. (Id. ) Downey further proposed:
If the Consulting Agreement is terminated I will have the sole option of having the patents assigned back to me or revoking the [license], as the case may be. This will allow DRI to continue to market and sell the products manufactured using the patents at the same remuneration rate, or having DRI take permanent assignment of the patents, upon an agreed upon compensation, *477 which would [be] based upon a valuation at the time. Additionally, termination of the Licensing Agreement would not automatically occur upon termination of the Consulting Agreement.
(Id. ) In the second May 5 email, Dodge responded to Downey's revisions and, regarding Downey's patent-related proposal, Dodge stated:
[A]ll intellectual property, patents and copyrights developed during the course of employment with DRI by any employee must be assigned to the Company....
Paul, let's be clear. At no time, did I or any member of the DRI Board or management represent that you or companies owned by you could claim ownership of patentable Regupol product applications technology developed by the Company during your employment. What we did discuss was the form and duration of appropriate compensation for unique, new, patentable applications of Regupol, which we encourage. The Special Commission Agreement addresses this issue, which you and I discussed previously. The Special Commission Agreement can be with CSR Tech Holdings Inc, or whatever entity you prefer, but DRI funded patents must remain irrevocably with DRI.
* * *
While [I] understand and appreciate that time is of the essence for you, any modification of our current offer will require the consent of the Board.
(Id. ) Downey then responded in a third email, stating: "The agreements aren't much use unless we have the basics in place. When we met in Toronto in July 2005 and again in Lancaster in March 2006 we discussed and consented to three general principles[.]" (Id. ) According to Downey's email, one of these principles was "[t]o provide compensation for patent assignment."[26] (Id. ) In his email, Downey told Dodge: "None of this is news to you. If you need to have those discussions with the Board, you should have them now." (Id. )
The negotiations continued, and in a November 8, 2006 email to Downey, Dodge noted that Ecore had borne all the costs of defending the patents - a sum Dodge said was between $750,000 and $1 million. (Id. ) Downey responded the next day, stating, in part: "I think we have already outlined what is close to an agreement. We actually need to have something written down that makes sense to both of us. The Board needs to review the agreement for patent licensing that I tabled in August." (Id. ) Dodge responded later that day, stating:
Again, let's be straight. We've kicked around a lot of scenarios, but agreed on nothing.
Your answer does not address the issues I put to you yesterday.
What specifically do you want as a fair and reasonable compensation package.
[I] understand what is in the proposed Licensing Agreement, but what more do you expect."
Please be very clear and unambiguous here.
(Id. ) Downey subsequently sent a detailed response outlining "[t]he specifics of the new proposed agreement," which Downey stated "are consistent with our verbal discussions and are based on a continuation of the current consulting agreement with the following changes." (Id. ) The changes *478 outlined in Downey's email related to his position and title with the company, his compensation, and "Patent Licensing: as proposed." (Id. ) Downey closed the email by stating: Please review so that we can formalize the agreement and get going towards taking on our continued business growth." (Id. )
It is undisputed that beginning in 2007, the CSR/Downey incentive bonus was increased to 12 percent of the sound and vibration unit operating profit.[27] (Defs.' SJ Ex. W, X; Downey 8/29/16 Dep. 140.) However, the issue of patent compensation remained unresolved. Defendants contend that during the time Ecore was pursuing the Reissue Application, Dodge repeatedly assured Downey that he would be reasonably compensated under the October 2001 "Agreement." (Downey 1/3/2017 Decl. ¶¶ 17-18.) On October 1, 2007, Dodge sent Downey an email stating:
This confirms our understanding that your agreement to sign the authorization for the reissue of the '723 patent does not negate DRI's responsibility to reasonably compensate you thereunder.
(Defs.' SJ Ex. I; Defs.' SJ Opp. Ex. 11.) According to Dodge, this email did not acknowledge the alleged October 2001 "Agreement," but, rather, referred only to "[t]he bonus compensation that [Downey] was and had historically been receiving." (Dodge 8/22/16 Dep. 93.)
In early 2008, the independent members of Ecore's Board of Directors rejected Downey's demand for additional compensation for the ISI invention patents, and instead proposed potential future long-term compensation conditioned on Downey staying with Ecore for at least ten years. (Defs.' SJ Ex. W.) In a January 11, 2008 email to Downey forwarding the Board of Directors' decision, Dodge stated: "We agreed that we would all be bound by the decision of the independent directors, hence I believe that [the patent compensation] issue is now resolved." (Id. ) The issue, however, was not resolved and, in his May 22, 2010 letter to Dodge enclosing the executed inventor declaration for the Reissue Application, Downey stated that he "[was] not waiving any of my claims relating to the [ '723 Patent], or any reissued patent, including claims to compensation." (Defs.' SJ Ex. J.)
On March 10, 2011, Dodge sent an email to Ecore's CFO, stating: "[Downey] wants comp for coming up with the patent concept in the event he's terminated, quits or dies. Told him I'd think about it as soon as the patent is enforceable. Quasi golden handcuffs."[28] (Defs.' SJ Ex. L.) Shortly thereafter, in a March 22, 2011 email to Dodge about other business issues, Downey asked Dodge: "What is your status on the proposal for Ecore compensating me for my patent?" (Pl's SJ Reply Ex. D.) Finally, in a letter to Dodge dated June 29, 2011, Downey stated that Dodge was "ignor[ing]" and "stonewall[ing]" his "10-year-old claim to compensation from our agreement on the reissued patent." (Pl.'s *479 SJ Ex. U; Defs.' SJ Ex. O.) Downey later testified in his deposition that despite negotiations with Dodge "over the course of several years," Dodge "never fulfilled his promise" to reasonably compensate Downey for the Assignment. (Downey 8/29/16 Dep. 190-91, 225-26.) Ecore asserts that it paid CSR a total of almost $1.9 million in fees and expenses between 2000 and 2010, and that it paid Downey a total of more than $1.5 million in commissions between 2003 and 2010. (Pl.'s SJ Ex. Q.)
5. Downey's Formation and Operation Of Pliteq
In 2006, Downey formed Pliteq, Inc. "[f]or the production and sale of treadmill pad products and an acoustical isolation clip." (Downey 8/29/16 Dep. 11.) Initially, Pliteq sold products that did not compete with Ecore's. (Id. at 11-13.) However, in approximately 2009, Downey began buying the QTscu product from Ecore, re-labeling it, and re-selling it as a competing Pliteq product called GenieMat. (Id. at 13, 42-43; Freidkes Dep. 33-34.)[29]
Defendants claim that Dodge knew of and approved Pliteq's sale of its GenieMat as a "private label" version of Ecore's QTscu product. (Downey 8/29/16 Dep. 42-43.) Defendants point to a chain of email messages Downey forwarded to Dodge on September 29, 2010. (Defs.' SJ Ex. U; Defs.' SJ Opp. Ex. 5.) The forwarded messages appear to contain Downey's discussions with a third party named John LoVerde about Ecore competitors' products and price comparisons. (Id. ) In his message to Dodge forwarding the email chain, Downey stated: "This is what I'm dealing with - note the last paragraph." (Id. ) In the last paragraph of the most recent forwarded email, LoVerde appears to be recounting to Downey that a potential Ecore customer was considering buying a competitor's comparable product - called Regupol-Impacta - at prices and terms that were better than Ecore's. (Id. ) In the last paragraph of the earliest email in the chain, Downey told LoVerde that he had informed the potential customer that:
[W]e will sell a private label of QT, called Pliteq GenieMat, through our distributor ... It won't have the same level of testing, or say QT on it, but at least is comparable with the SoundSeal testing, and we can provide a letter saying it is a private label as manufactured by Ecore.
(Id. )
In response to the forwarded email chain, Dodge replied to Downey, stating: "F*** them ... cut their throat on price.... Take no prisoners ... we'll clean up the market mess once we have the reissue in hand." (Id. ) According to Defendants, the forwarded email chain represented Downey's "proposal" to Dodge for Pliteq to sell a private label version of Ecore's QT product, and Dodge's response represented his "emphatic" agreement to that "proposal." (Defs.' SJ Opp. 49-51; see also Downey 8/29/16 Dep. 42-43.) Defendants contend that Dodge's approval of Pliteq's activities is confirmed by independent sales representative John Freidkes, who testified that he overheard Downey's side of a telephone call in which Downey told Dodge: "We need to sell an inexpensive mat without destroying the QT brand." (Freidkes Dep. 44-45.) Freidkes, who did not hear Dodge's side of the conversation, testified that Downey told him "he had Art's approval to sell a competitive mat." (Id. )
In contrast to Defendants' account of these events, Ecore asserts that Downey never had permission to disclose Ecore's proprietary information to Pliteq or to use *480 that information to sell Pliteq's GenieMat product in competition with Ecore. (Pl.'s SJ Br. 14-15; Pl.'s SJ Reply 9-12; Dodge 8/22/16 Dep. 111-116.) Regarding the email chain Downey forwarded on September 29, 2010, Dodge testified that at the time, he did not even read the last paragraph of the earliest forwarded email. (Dodge 8/22/2016 Dep. 114-16.) Dodge further testified that his response to Downey referred to the competing Regupol-Impacta product referenced in the most recent forwarded email. (Id. at 117.) According to Ecore, it did not know that Pliteq existed until mid-July 2011. (Dodge 10/25/2012 Dep. 112, Pl.'s SJ Reply Ex. B.) Specifically, on July 13, 2011, Ecore's vice president of operations sent Dodge an email asking: "Do you know anything about a company called Pliteq? They sell sound underlayment under the name GenieMat™ RST02." (Pl's SJ Reply Ex. C.) The same day, Dodge forwarded this inquiry to another Ecore employee and asked: "Who is this?" (Id. ) In response, the employee told Dodge: "We have never heard of them. They are out of Toronto. Here is the website...." (Id. ) Dodge then replied: "See if we can do a background check to see who owns this Co.?" (Id. )
According to Ecore, as soon as Dodge learned of Downey's activities through Pliteq, he immediately terminated the Consulting Agreement and "any actual or apparent authority of [Downey] and CSR to act on behalf of Ecore." (Pl.'s SJ Reply 12, Exs. C.)
6. The Related Litigation
a. The Ontario Proceedings
In February 2011, Downey filed an action against Ecore in Ontario, Canada (the "Ontario Proceedings"), alleging that Ecore "failed to honour an oral promise [the alleged October 2001 'Agreement'] to 'reasonably compensate' him for his assignment of the [ISI invention." (Ontario Ct. App. Op. ¶ 25; Downey Stmt. of Claim 8, Defs.' SJ Ex. P.) In the Ontario Proceedings, Downey sought "damages, or in the alternative, rescission of his assignment of the invention[ ] and an accounting of profits by Ecore." (Ontario Ct. App. Op. ¶ 25.)
Ecore filed a motion to stay or dismiss the Ontario Proceedings on the ground that under the forum selection clause of the Confidentiality Agreement, the courts of Pennsylvania had exclusive jurisdiction over the action. (Id. ¶ 26.) The motion judge denied Ecore's motion, finding that although Downey's claims arose out of and related to his business relations with Ecore, and would otherwise fall within the scope of the Confidentiality Agreement, "Downey never received consideration for executing the Confidentiality Agreement and is not personally bound by its terms, including the [forum selection clause] contained therein." (Ontario Sup. Ct. Op. ¶¶ 37, 41.) The motion judge rejected Ecore's argument that Downey's consideration for the Confidentiality Agreement was the access to proprietary information and the compensation that he received, through CSR, under the Consulting Agreement, (Id. ¶¶ 34-37.) According to the motion judge, "CSR, not Downey, [was] the party to the Consulting Agreement," and pursuant to that agreement, the confidential information and compensation was to flow to CSR. (Id. ¶ 35.)
On Ecore's appeal, the Ontario Court of Appeal reversed, ruling that the Confidentiality Agreement was supported by valid consideration and was binding upon Downey.[30] (Ontario Ct. App. Op. 36, 59.) Construing the Consulting *481 and Confidentiality Agreements together, and considering the factual circumstances under which they were executed, the Ontario Court of Appeals reasoned:
The motion judge erred in finding that Ecore accepted that CSR would receive both the Proprietary Information and the benefits flowing from Downey's relationship with Ecore. The wording of the agreements and the overall factual matrix reveals that the de facto relationship between the parties was between Ecore and Downey. It was Downey, not CSR, who committed to perform the consulting services. And it was Downey who would receive the benefits arising from the relationship with Ecore, whether directly or through the corporate vehicle of CSR.
(Id. ¶ 47.) The court further noted that the interpretation adopted by the motion judge would render the Confidentiality Agreement meaningless and lead to a commercially absurd result. (Id. ¶ 51.)
[O]n the motion judge's findings, neither Downey nor CSR is bound by the Confidentiality Agreement. Downey is not bound because, in the motion judge's view, there was no consideration for the agreement. And CSR is not bound because it is not a party to the agreement. On this interpretation, Ecore is deprived of the very protection of its intellectual property for which it bargained.
(Id. ¶ 52.)
b. The Re-labeling Case
On May 18, 2012, Ecore filed a separate action in this District against Downey, Pliteq, and Dart Advantage Warehousing, Inc. ("Dart"), alleging claims of reverse passing off and false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a), and a claim of common law unfair competition. (Compl., Ecore Int'l, Inc. v. Downey , No. 12-2729 (E.D. Pa.) (the "Re-labeling Case"), ECF No. 1, Defs' SJ Ex. Z.) The Re-labeling Case centered on Ecore's allegations that Pliteq and Downey, using Dart's employees and warehouse, obtained shipments of Ecore's rubber underlayment products, removed the Ecore labels and re-labeled the products as Pliteq's, then re-packaged the products for shipment to Pliteq's customers. (Id. ¶¶ 11, 34, 39.) Ecore's complaint and accompanying motion in the Re-labeling Case sought, inter alia , damages, a temporary restraining order, and preliminary and permanent injunctive relief. (Re-labeling Case, ECF Nos. 1, 2.).[31]
Ultimately, Ecore, Downey, and Pliteq entered into a settlement agreement, effective July 2, 2015, resolving "all Claims asserted in the Action, including the Remaining Claims" (the "July 2, 2015 Agreement").
*482 [32] (July 2, 2015 Agmt. 2.) The July 2, 2015 Agreement defines the "Claims" as "Ecore's claims asserted in the Action." (Id. at 1.) The "Action" is defined as Ecore's lawsuit "alleging reverse passing off and false advertising under [the Lanham Act] and common law unfair competition, for, among other things, the rebranding of Ecore's QT - Resilient Base Mat ... as the Downey Defendants' goods and additional statements relating to the Downey Defendants' sales of goods." (Id. at 1.) Ecore's "Injunctive Claims" are defined as those seeking to restrain Defendants from "(1) using, offering for use, displaying the content of, or engaging in any act likely to cause confusion, mistake, or (2) misleading as to the origin and source of Plaintiff's goods, or (3) misrepresenting the nature, characteristics, or qualities thereof, or (4) otherwise reverse passing off Plaintiff's goods as the Downey Defendants' goods." (Id. at 1-2.) Ecore's "Remaining Claims" refer to the additional relief sought, including disgorgement, damages, and attorneys' fees. (Id. at 2.)
Pursuant to the July 2, 2015 Agreement, Downey and Pliteq agreed to permanently refrain from re-labeling Ecore's products, unless permitted by a future written agreement, and the parties agreed to a dismissal of the Re-labeling Case with prejudice. (Id. ) The parties' Joint Stipulation of Dismissal With Prejudice was filed with the court on July 7, 2015. (Re-labeling Case, ECF No. 82.) Both the July 2, 2015 Agreement and the Joint Stipulation include language stating that nothing therein "shall affect the claims and counterclaims pending in [Case No. 11-6843]." (July 2, 2015 Agmt. ¶ 3; Re-labeling Case, ECF No. 82.)
B. Relevant Procedural History
Ecore filed its initial Complaint in Case No. 11-6843 on November 1, 2011. (ECF No. 1.) Defendants filed an Answer to the Complaint on February 6, 2012. (ECF No. 18.) On March 2, 2012, Defendants filed a Motion to Dismiss Or, In the Alternative, Stay Case No. 11-6843 pursuant to principles of comity pending a decision by the Ontario Court of Appeal in the Ontario Proceedings.[33] (ECF No. 20.) On March 30, 2012, Case No. 11-6843 was stayed and placed in civil suspense pending a decision by the appellate court in the Ontario Proceedings. (ECF No. 23.)
On September 7, 2012, after the Ontario Court of Appeal issued its decision, the parties filed a Joint Motion To Remove From Civil Suspense. (ECF No. 24.) Case No. 11-6843 was restored to the active docket on September 19, 2012. (Sept. 19, 2012 ECF Entry (Court only).) On October 11, 2012, Defendants filed Counterclaims against Ecore and Dodge. (ECF No. 31.) Ecore and Dodge then filed a Motion to Dismiss certain of the Counterclaims pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1). (ECF No. 35.) Defendants filed an opposition to the Motion to Dismiss on December 12, 2012; Ecore and Dodge filed a Reply on January 4, 2013. (ECF Nos. 37, 38.) On June 5, 2014, Case No. 11-6843 and the Re-labeling Case were jointly referred to Magistrate Judge Richard A. Lloret for settlement purposes.[34] (ECF No. 41.)
*483 On July 14, 2015, we approved the parties' Stipulation permitting Ecore to file an Amended Complaint and withdrawing Ecore's Motion to Dismiss Defendants' Counterclaims. (ECF No. 48.) Ecore filed its Amended Complaint the same day, asserting claims against all Defendants for violation the Lanham Act, 15 U.S.C. § 1125 (Count I), common law unfair competition (Count II), and misappropriation of trade secrets (Count III); against Downey and CSR for breach of the Consulting and Confidentiality Agreements (Count IV) and breach of restrictive covenant (Count VI); and against Downey for interference with actual and prospective contractual relations (Count V). The Amended Complaint added new allegations in support of Ecore's Lanham Act claim that were not alleged in the original Complaint. (Compare Am. Compl. ¶¶ 38-69, 80-89, with Compl. ¶ 38-65, ECF No. 1.) The new allegations allege that Defendants "doctored" reports of tests conducted on Ecore's products, by changing the names of the tested products, the manufacturers, and the report dates, to make it appear that the test reports applied to Pliteq products. (Am. Compl. ¶¶ 61-69, 86-88.)
On August 13, 2015, Defendants filed their Answer to the Amended Complaint, asserting the following Counterclaims:
• by Downey against Ecore for breach of the October 2001 "Agreement" (Countercl. I), quantum meruit/unjust enrichment (in the alternative to Countercl. I) (Countercl. II), infringement of the '430 Patent (Countercl. XII), and infringement of the '029 Patent (Countercl. XIII);
• by CSR against Ecore for breach of the Consulting Agreement (Countercl. III) and quantum meruit/unjust enrichment (in the alternative to Countercl. III) (Countercl. IV);
• by Downey and CSR against Ecore for promissory estoppel (Countercl. V), and against Ecore and Dodge for fraudulent inducement (Countercl. VI);
• by Pliteq against Ecore and Dodge for tortious interference with contract (Countercl. VII) and tortious interference with prospective contract (Countercl. VIII); and
• by Pliteq against Ecore for false advertising in violation of the Lanham Act (Countercls. IX, X), common law unfair competition (Countercl. XI), and false marketing (Countercl. XIV).
(ECF No. 50.)
On April 8, 2016, Ecore filed a Motion for Leave to File a Second Amended Complaint (ECF No. 58); Defendants filed an opposition to the Motion on April 18, 2016. (ECF No. 60.) On April 19, 2016, after conducting a status conference with the parties, the Court issued an Order denying Ecore's Motion for Leave to File a Second Amended Complaint. (ECF No. 62.) On April 26, 2016, Ecore filed Case No. 16-1993, alleging in its Complaint claims against Downey for conversion of the '029 Patent and underlying intellectual property (Count I), and against Pliteq for infringement of the Reissue Patent (Count II). On May 23, 2016, Ecore filed a Motion to Consolidate Case Nos. 16-1993 and 11-6843. (ECF No. 63.) The cases were consolidated by Order dated June 15, 2016.[35] (ECF No. 64.)
*484 On August 11, 2016, Downey and Pliteq filed a Motion, pursuant to Rule 12(b)(6), to Dismiss Ecore's conversion and patent infringement claims asserted as Counts I and II in Case No. 16-1993. (ECF No. 70.)[36] Subsequently, Defendants filed a Motion for Judgment on the Pleadings as to portions of Ecore's Lanham Act and unfair competition claims asserted in Case No. 11-6843. (ECF No. 86.) Defendants' Motion to Dismiss and Motion for Judgment on the Pleadings were both denied. (ECF Nos. 132, 131.)
II. LEGAL STANDARD
Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. See Kaucher v. County of Bucks , 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ). "[A] factual dispute is material only if it might affect the outcome of the suit under governing law." Id.
Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case. Celotex Corp. v. Catrett , 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ; UPMC Health Sys. v. Metro. Life Ins. Co. , 391 F.3d 497, 502 (3d Cir. 2004). If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(c) ("A party asserting that a fact ... is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record...."); see also Matsushita Elec. Indus. Co., v. Zenith Radio Corp. , 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (noting that nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts" (citation omitted) ). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,' " Matsushita , 475 U.S. at 587, 106 S.Ct. 1348 (citation omitted).
When deciding a motion for summary judgment, the court must view the facts and inferences in the light most favorable to the nonmoving party, and must not resolve factual disputes or make credibility determinations. See Big Apple BMW, Inc. v. BMW of North America, Inc. , 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied , 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993). However, "unsupported assertions, conclusory allegations, or mere suspicions" are insufficient to overcome a motion for summary judgment. Schaar v. Lehigh Valley Health Servs., Inc. , 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester , 891 F.2d 458, 460 (3d Cir. 1989) ). "[A] mere 'scintilla of evidence' in the nonmovant's favor does not create a genuine issue of fact and the non-movant may not rest on speculation and conjecture in opposing *485 a motion for summary judgment." Ramara, Inc. v. Westfield Ins. Co. , 814 F.3d 660, 666 (3d Cir. 2016) (internal quotation marks and citations omitted). Courts must not resolve factual disputes or make credibility determinations. Siegel v. Transfer, Inc. v. Carrier Express, Inc. , 54 F.3d 1125, 1127 (3d Cir. 1995). "The same standards and burdens apply on cross-motions for summary judgment." Allah v. Ricci , 532 F. App'x 48, 50 (3d Cir. 2013) (citing Appelmans v. City of Phila. , 826 F.2d 214, 216 (3d Cir. 1987) ). "When both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.' " Auto-Owners Ins. Co. v. Stevens & Ricci Inc. , 835 F.3d 388, 402 (3d Cir. 2016) (quoting 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2720 (3d ed. 2016) ).
III. DISCUSSION[37]
A. Downey's Breach of Contract Claim (Countercl. I)
Under Pennsylvania law, a party alleging breach of contract "must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages.' " Ware v. Rodale Press, Inc. , 322 F.3d 218, 225 (3d Cir, 2003) (quoting CoreStates Bank, N.A. v. Cutillo , 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999) ).
Ecore and Downey both seek summary judgment on Downey's counterclaim for breach of the alleged October 2001 "Agreement." In their competing Motions, the parties dispute: (1) whether an oral agreement existed, with sufficiently definite terms, obligating Ecore to separately compensate Downey for the ISI invention and Assignment; (2) whether the alleged oral agreement is supported by consideration; and (2) whether the statute of limitations bars Downey's claim under the alleged agreement.
Defendants contend that there are no genuine issues of material fact regarding the existence of the October 2001 "Agreement," which, according to Defendants, "supersede[d] the Confidentiality Agreement with respect to the assignment of the ISI invention." (Defs.' SJ Opp. 28.) In support of their position, Defendants cite to Downey's assertion that his execution of the Assignment constituted acceptance of Dodge's offer (on behalf of Ecore) to reasonably compensate Downey for the invention and Assignment. (Id. at 29.) Defendants contend that Dodge repeatedly reaffirmed the alleged agreement, including in writing in his October 1, 2007 email, which stated: "This confirms our understanding that your agreement to sign the authorization for the reissue of the '723 patent does not negate DRI's responsibility to reasonably compensate you thereunder."
*486 (Defs.' SJ Ex. I; Downey 1/3/17 Decl. ¶¶ 14-15, 17-19.)
According to Defendants, "Ecore's promise to provide reasonable compensation for the assignment is valid consideration, as evidenced by the fact that both parties manifested their mutual assent to be bound by the terms of the October 2001 Agreement, as well as their understanding of such terms." (Defs.' SJ Opp. 29.) Defendants argue that "Ecore received as consideration clear title to the ISI invention as a result of the parties entering into the October 2001 Agreement." (Id. at 30.) Defendants contend that the alleged agreement "is a valid, enforceable contract" under Pennsylvania law even though it omits the amount of the compensation. (Defs.' SJ Opp. 28-29.) Defendants also contend that "it is disputed that the term "Proprietary Information" in the Confidentiality Agreement covers the ISI invention"; that "the agreement ... on its face does not bind Downey himself, only CSR"; that the Confidentiality Agreement only applied during Downey's employment; and that "Downey was never employed by DRI or Ecore because the [Consulting Agreement] was between Ecore and CSR." (Id. ) Finally, Defendants argue that Downey's claim is timely under several tolling doctrines.
Ecore argues that Downey cannot establish the existence of the alleged contract "because there was never an agreement to compensate him for the Assignment above and beyond the funds he received ... under the Consulting Agreement." (Pl.'s SJ Opp. 9.) Ecore points to Dodge's testimony that Ecore "never" agreed to separately compensate Downey for the ISI invention and assignment, and "had no duty or obligation to compensate Mr. Downey for something he was legally obligated to do pursuant to his employment agreement." (Dodge 8/22/16 Dep. 88.) Ecore disputes Defendants' characterization of Dodge's October 1, 2007 email, which, according to Dodge, referred only to "[t]he bonus compensation that [Downey] was and had historically been receiving." (Id. at 93.) Moreover, Ecore argues, Downey confirmed the absence of any agreement when he referred, in his March 22, 2011 email, to "the proposal for Ecore compensating me for my patent." (Pl.'s SJ Reply Ex. D.) Ecore argues that the alleged oral agreement is, at most, an unenforceable "agreement to agree" because it omits essential terms, namely, the amount and timing of Downey's compensation. (Pl.'s SJ Opp. 11.) Ecore further argues that the alleged agreement is unsupported by consideration because Downey was already required to assign the ISI invention and Patents under the Confidentiality Agreement, which the Ontario Proceedings determined is enforceable against Downey. Finally, Ecore contends that Downey's claim is time-barred, and that none of the equitable doctrines cited by Defendants are applicable in this case to toll the four-year statute of limitations.
For the reasons discussed below, we find that the alleged October 2001 "Agreement" is not a valid, enforceable contract. We further find that even if the alleged oral contract existed and was enforceable, Downey's claims are barred by the statute of limitations. Accordingly, summary judgment will be granted in favor of Ecore and against Downey with respect to Counterclaim I.
1. Existence and Terms of the Alleged Oral Agreement
The party relying on an alleged oral contract-in this case, Downey-has the burden of proving its existence.[38] See *487 Edmondson v. Zetusky , 674 A.2d 760, 764 (Pa. Commw. Ct. 1996). "To establish the existence of an agreement one must show that: (1) both parties have manifested an intention to be bound by the terms of the agreement; (2) the terms of the agreement are sufficiently definite to be specifically enforced; and, (3) there is mutuality of consideration." Redick v. Kraft, Inc. , 745 F. Supp. 296, 300 (E.D. Pa. 1990) (citing Channel Home Ctrs. v. Grossman , 795 F.2d 291, 298-99 (3d Cir. 1986) ); see also Szymanski v. Sacchetta , No. 10-2336, 2012 WL 246249, at *4 (E.D. Pa. Jan. 26, 2012) (setting forth elements of enforceable contract). "For a contract to be enforceable, the nature and extent of the mutual obligations must be certain, and the parties must have agreed on the material and necessary details of their bargain." Lackner v. Glosser , 892 A.2d 21, 30 (Pa. Super. Ct. 2006). "[A] contract may be manifest orally, in writing, or as an inference from the acts and conduct of the parties." Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C. , 635 Pa. 427, 137 A.3d 1247, 1258 (2016) (quoting J.F. Walker Co., Inc. v. Excalibur Oil Grp., Inc. , 792 A.2d 1269, 1272 (Pa. Super. Ct. 2002) ); see also Orta v. Con-Way Transp. , No. 02-1673, 2002 WL 31262063, at *1 (E.D. Pa. Oct. 8, 2002) ("Pennsylvania recognizes and enforces oral agreements." (citation omitted) ).
"Under Pennsylvania law, 'where the facts are in dispute, the question of whether a contract was formed is for the jury to decide.' " Quandry Sols. Inc. v. Verifone Inc. , No. 07-097, 2009 WL 997041, at *5 (E.D. Pa. Apr. 13, 2009) (quoting Ingrassia Constr. Co. v. Walsh , 337 Pa.Super. 58, 486 A.2d 478, 482 (1984) ). "However, '[t]he question of whether an undisputed set of facts establishes *488 a contract is a matter of law.' " Id. (quoting Mountain Props., Inc. v. Tyler Hill Realty Corp. , 767 A.2d 1096, 1101 (Pa. Super. Ct. 2001) ); see also Legendary Art, LLC v. Godard , 888 F. Supp. 2d 577, 585 (E.D. Pa. 2012) ("The question of whether an undisputed set of facts establishes a contract is typically one of law, but where the facts are in dispute, the question is for the jury to decide." (citing Szymanski , 2012 WL 246249, at *4 ) ).
"Given that the intent of the parties to be bound is a requisite element of contract formation, 'oral contracts make it particularly difficult to extricate the matters of law from the questions of fact. Nevertheless, the allegation that an oral contract exists does not automatically entitle a plaintiff to a jury trial.' " Bennett v. Itochu Int'l, Inc. , Nos. 09-1819, 09-4123, 2012 WL 3627404, at *15 (E.D. Pa. Aug. 23, 2012) (quoting Quandry , 2009 WL 997041, at *5-6 ), aff'd 572 F. App'x 80 (3d Cir. 2014). "Contract formation is a matter of law ripe for determination by the Court if a binding contract could not exist under the undisputed set of facts." Id. (citing Quandry , 2009 WL 997041, at *5 ). "The [c]ourt must determine whether a reasonable jury, considering the parties' undisputed actions and words, could find that they formed a binding oral contract. That inquiry may be resolved at the summary judgment stage." Id. ; see also Quandry , 2009 WL 997041, at *6 (noting that court can determine, based on undisputed facts, whether oral contract was formed as a matter of law); Landan v. Wal-Mart Real Est. Bus. Trust , No. 12-926, 2015 WL 1491257, at *8 (W.D. Pa. Mar. 31, 2015) (finding that the undisputed evidence compelled the conclusion that the parties did not manifest the intent to be bound).
In determining the existence of an alleged oral contract, the threshold inquiry is whether the parties manifested mutual intent to be bound by the terms of the agreement, Guzzi v. Morano , No. 10-1112, 2013 WL 4042511, at *10 (E.D. Pa. Aug. 8, 2013) ; see also ATACS Corp. v. Trans World Commc'ns, Inc. , 155 F.3d 659, 665-66 (3d Cir. 1998) ("While typically analyzed in terms of offer and acceptance, the decisive inquiry in contract formation is the manifestation of the parties to the terms of the promise and to the consideration for it." (internal quotation and citation omitted) ). " 'In assessing intent, the object of the inquiry is not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior.' " Landan , 2015 WL 1491257, at *6 (quoting Am. Eagle Outfitters v. Lyle & Scott Ltd. , 584 F.3d 575, 582 (3d Cir. 2009) ); see also Legendary Art , 888 F. Supp. 2d at 585 (same). In cases involving oral contracts, " 'courts must look to surrounding circumstances and course of dealing between the parties in order to ascertain their intent.' " Legendary Art , 888 F. Supp. 2d at 585 (quoting Szymanski , 2012 WL 246249, at *4 ); see also Bennett , 2012 WL 3627404, at *16 (noting that where an alleged contract is " 'wholly or partially composed of oral communications, the precise content of which are not of record, courts must look to the surrounding circumstances and course of dealing between the parties in order to ascertain their intent.' " (quoting Mountain Props. , 767 A.2d at 1101 ) ).
"While in some instances an exchange of e-mails, and other oral communications between parties, may be sufficient to establish a contract, such exchanges do not always rise to the level of enforceable agreements." Reynolds Packaging KAMA, Inc. v. Inline Plastics Corp. , No. 08-1902, 2011 WL 5089500, at *8 (M.D. Pa. Oct. 25, 2011) (internal citation omitted). The party relying upon an *489 alleged oral contract must do more than show "preliminary negotiations or an agreement to enter into a binding contract in the future; to succeed, the party must prove that a mutual intent to be bound manifested, even though it was not memorialized in writing." Bennett , 2012 WL 3627404, at *16 ; see also Reynolds , 2011 WL 5089500, at *8 ("Pennsylvania courts agree that '[a]n agreement to agree is incapable of enforcement.' " (quoting Highland Sewer and Water Auth. v. Forest Hills Municipal Auth. , 797 A.2d 385, 390 (Pa. Commw. Ct. 2002) ) ). "Thus, the mere statement of an aspirational goal to reach some future agreement is not an enforceable contract in Pennsylvania." Reynolds , 2011 WL 5089500, at *8 (citing Channel Home Ctrs. , 795 F.2d at 298 ; see also ATACS Corp. , 155 F.3d at 666 ("[I]t is well established that evidence of preliminary negotiations or a general agreement to enter a binding contract in the future fail as enforceable contracts because the parties themselves have not come to an agreement on the essential terms of the bargain and therefore there is nothing for the court to enforce.").
As to the second element of contract formation - sufficiently definite terms - Pennsylvania has adopted the Restatement (Second) of Contracts. Reed v. Pittsburgh Bd. of Pub. Educ. , 862 A.2d 131, 135 (Pa. Commw. Ct. 2004). The Restatement provides:
(1) Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.
(2) The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.
(3) The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.
Restatement (Second) of Contracts § 33 (1981) ; see also Lackner , 892 A.2d at 30 ("An enforceable contract requires, among other things, that the terms of the bargain be set forth with sufficient clarity." (citation omitted) ). "Incompleteness of terms is one of the primary reasons statements of preliminary negotiations are not deemed offers." Legendary Art , 888 F. Supp. 2d at 586 (quoting Reed , 862 A.2d at 135 ). Moreover, "in oral agreements, vague statements that fail to include material terms, are indicia that agreements are too uncertain to be enforced." Sloan v. Frascella , No. 12-3609, 2013 WL 4433366, at *3 (E.D. Pa. Aug. 16, 2013) (collecting cases finding agreements too indefinite to be enforced). "The more important the uncertainty, the stronger the indication is that the parties do not intend to be bound." Restatement (Second) of Contracts § 33, cmt. f (1981).
The fact that an agreement omits an essential term, such as price, "does not vitiate contract formation if the parties otherwise manifested their mutual assent to the agreement and the terms of that agreement are sufficiently definite," ATACS Corp. , 155 F.3d at 667 (citations omitted). However, "[w]here ... there is no agreement or even a discussion as to any of the essential terms of an alleged bargain, such as time or manner of performance, or price or consideration, the 'agreement' is too indefinite for a party to reasonably believe that it could be enforceable in an action at law." Lackner , 892 A.2d at 31 (italics in original). Moreover, as a matter of law, courts "may not provide a reasonable term where an essential term is left open." Sloan , 2013 WL 4433366, at *3 (citing *490 Morris v. Ace Med. Co. , No. 95-1271, 1996 WL 69400, at *6 (E.D. Pa. Feb. 16, 1996)aff'd , 96 F.3d 1433 (3d Cir. 1996) ).
Applying the foregoing principles to the undisputed evidence in this case, we find that the alleged October 2001 "Agreement" is not an enforceable contract. First, no reasonable fact finder could conclude that the parties manifested the intent to be bound by the alleged agreement. In reaching this conclusion, we accept Downey's assertion that at the time of the Assignment, Dodge told him he would be "reasonably compensated" for assigning the ISI invention to Ecore. However, Dodge's October 2001 statement-construed in context with the circumstances and content of the parties' previous and subsequent course of dealings and communications-establishes, at most , that the parties' expected future negotiations for adjustments to Downey's compensation under the Consulting Agreement to consider his contributions to the ISI invention. The parties' October 2001 communications, assuming they occurred as Downey claims, fall far short of what would be necessary for a jury to find the existence of an enforceable contract. See Lackner , 892 A.2d at 31-32 (affirming trial court's grant of summary judgment to defendant where evidence of record was "woefully inadequate" to establish that alleged promise of future compensation for patent assignment constituted an enforceable oral agreement). Moreover, the existence of the alleged oral agreement is belied by the rather extensive written - and undisputed - evidence of the parties' communications and course of dealing.
The evidence, which is exhaustively recounted above, reflects that when the parties intended to enter into binding agreements-such as the Consulting and Confidentiality Agreements-they did so in writing. For example, during their November 2006 compensation negotiations, Downey stated: "I think we have already outlined what is close to an agreement. We actually need to have something written down that makes sense to both of us." (Pl.'s SJ Ex. T.) It was also the practice of both parties to even memorialize the terms of their respective offers and counteroffers in writing. In all of the pre-2011 written communications regarding compensation, there is no express reference to the alleged October 2001 "Agreement," and no reference at all to patent-related compensation until 2005. Moreover, once Downey and Dodge began negotiating patent compensation, Downey repeatedly characterized the issue in terms of "proposals," an acknowledgment that no prior agreement existed. See, e.g., Landan , 2015 WL 1491257, at *8 (noting that "all objective evidence negates the existence of [alleged oral] agreement"); Legendary Art , 888 F. Supp. 2d at 587 (finding no intent to be bound where "the parties behaved as though they were engaged in negotiations, and not as if an agreement had been finalized"); Quandry , 2009 WL 997041, at *12 (reasoning that parties' subsequent behavior and exchange of written documents weighed against existence of alleged oral agreement). On this record, no reasonable jury could find that the parties manifested a mutual intent to enter into a binding oral agreement for patent compensation in 2001.
Second, the terms of the alleged October 2001 "Agreement" are too uncertain to constitute an enforceable contract. Specifically, the alleged agreement does not identify what would constitute "reasonable compensation," how the compensation would be calculated, when it would be paid, whether it would be paid to Downey or one of his companies, or whether and to what extent Downey would share in the costs of procuring, enforcing, or defending the patents. Significantly, essential terms such as *491 these were the subject of protracted negotiation when Dodge and Downey later exchanged written proposals for patent compensation. It defies reason to suggest that these parties would have agreed to be bound by an oral agreement that omitted any mention of such material terms. Moreover, the indefiniteness of the purported agreement means that determining whether a breach occurred, or determining an adequate remedy, would require the court to supply terms that the parties never agreed upon. See, e.g., Sloan , 2013 WL 4433366, at *4 ("Because [plaintiff] has failed to identify the material terms of the agreement, such as what her alleged 5% interest entitled her to, under what circumstances any profits would be distributed, and how those profits would be determined, there is no way to determine whether Defendants breached the agreement or what action would provide [plaintiff] an adequate remedy."); Legendary Art , 888 F. Supp. 2d at 588 (finding alleged oral agreement unenforceable where the alleged promises consisted of generalities and the material terms were undefined); Lackner , 892 A.2d at 32 ("This Court is prohibited ... from writing a contract for the parties when they themselves have failed to agree to essential terms." (citation omitted) ).
2. The Alleged Agreement Is Not Supported By Consideration
Even if Downey could satisfy the first two elements necessary to the existence of a contract, his claim fails at the third element because the alleged October 2001 "Agreement" is not supported by consideration. "Consideration is, of course, a required element of contract formation." ATACS Corp. , 155 F.3d at 665 ; see also Shedden v. Anadarko E. & P. Co., L.P. , 635 Pa. 381, 136 A.3d 485, 490 (2016) ("A contract, either oral or written, may be modified by a subsequent agreement which is supported by legally sufficient consideration, or a substitute therefor, and meets the requirements for contract formation.") "Consideration is 'an act, forbearance, or return promise bargained for and given in exchange for the original promise.' " Mucci v. Home Depot , No. 00-4946, 2001 WL 1609851, at *3 (E.D. Pa. Dec. 18, 2001) (quoting Universal Computer Sys. v. Med. Servs. Ass'n of Pa. , 474 F. Supp. 472, 477 (M.D. Pa. 1979), aff'd , 628 F.2d 820 (3d Cir. 1980) ).
Here, Downey contends that the consideration to Ecore was the Assignment and "clear title" to the ISI invention. (Defs.' SJ Opp. 30.) This purported consideration, however, is illusory because pursuant to the Confidentiality Agreement, Downey was already obligated to execute the Assignment, and Ecore already had clear title to the ISI invention. "It is axiomatic that the performance of an act which one party is legally bound to render to the other party is not legal consideration." Chatham Commc'ns, Inc. v. Gen. Press Corp. , 463 Pa. 292, 344 A.2d 837, 840 (1975) ; see also In re Commw.Tr. Co. of Pittsburgh , 357 Pa. 349, 54 A.2d 649, 651 (1947) ("A promise to do what the promisor is already bound to do cannot be a consideration, for if a person gets nothing in return for his promise but that to which he is already legally entitled, the consideration is unreal." (internal quotation omitted) ).
For the same reason, Ecore's alleged promise of "reasonable compensation" is not valid consideration to Downey, who was obligated to assign the invention with or without Ecore's alleged promise. See Lackner , 892 A.2d at 31 ("[A] promise to perform or forbear from performing must be supported by consideration. If the promise is entirely optional with the promisor, it is illusory, lacks consideration, and is unenforceable.");
*492 Nicolella v. Palmer , 432 Pa. 502, 248 A.2d 20, 23 (1968) ("[A] promise to pay additional compensation for the performance by the promisee of a contract which the promisee is already under obligation to the promisor to perform is without consideration."). The Confidentiality Agreement expressly provides that "[a]ll inventions or discoveries which relate to the Proprietary Information shall be the exclusive property of [Ecore]." (Confidentiality Agmt. § 4.) It further provides that:
Whenever requested by [Ecore], either during or subsequent to employment, [Downey] shall execute such instruments as [Ecore] deems necessary for the purpose of confirming [Ecore's] exclusive rights to any such invention or discovery under applicable intellectual property law, including but not limited to any application for Letters patent and assignments thereof.
(Id. ) Under the Confidentiality Agreement, "Proprietary Information" includes "all technology, know how, plans, designs, specifications, formulas, technical information, drawings, and other information related to the Company's products, production equipment, and manufacturing processes," as well as "all other information owned by or related to the Company which is not generally known within the industry in which the Company is engaged. (Confidentiality Agmt. § 1(a), (c).)
Downey received access to Ecore's Proprietary Information and developed the ISI invention in his capacity as Ecore's business development manager for industrial products, a role that included "the investigation and development of new business opportunities within industrial market segments." (Consulting Agmt § 1.) Moreover, as Ecore notes, and Downey's deposition testimony confirms, "the rubber product used in the invention underlying the patent was developed using (1) Ecore's pre-existing formula (6510-LC), (2) Ecore's manufacturing process, (3) Ecore's product samples and product spec sheets; and (4) the know-how of Ecore's employees to add the ideal amount of regrind to the existing formula." (Pl.'s SJ Br. 18.) Based on the uncontroverted evidence-including Downey's testimony in this and other litigation-there can be no genuine dispute that the ISI invention relates to Ecore's Proprietary Information. As such, Downey was contractually obligated by the Confidentiality Agreement to assign the invention to Ecore, and neither Downey's performance of that pre-existing obligation, nor Ecore's alleged promise to pay additional compensation for the performance, constitute consideration for the alleged October 2001 "Agreement"
Downey's arguments that the Confidentiality Agreement does not bind him because he was not a party to the Consulting Agreement and was never employed by Ecore were thoroughly considered and rejected in the Ontario Proceedings. In those proceedings, the Ontario Court of Appeal held, inter alia :
[W]hen the Consulting Agreement and Confidentiality Agreement are read together, the terms of those agreements reveal the parties' intentions that Ecore's Proprietary Information was to be protected in the hands of the person who was actually to receive that information - Downey.
* * *
The wording of the agreements and the overall factual matrix reveals that the de facto relationship between the parties was between Ecore and Downey.
(Ontario Ct. App. Op. ¶¶ 46, 47.) The court further found that the Confidentiality Agreement provision stating that it was to apply "during and after" Downey's employment with Ecore "simply confirms that Downey's confidentiality obligations were to survive the termination of his relationship *493 with Ecore. This makes commercial sense given the purpose of the agreed protections for Ecore's Proprietary Information." (Id. ¶ 61.)
The issues raised by Downey here: (1) are the same as those involved in the Ontario Proceedings; (2) were actually litigated in those proceedings; (3) were determined by the Ontario Court of Appeal; and (4) were essential to that court's judgment that the Confidentiality Agreement is binding and enforceable as to Downey. Significantly, Downey has not argued otherwise, and he has not challenged the fairness of the Ontario Proceedings or the validity of the Ontario Court of Appeal decision. Moreover, the Ontario Court of Appeal's analysis of these issues is consistent with Pennsylvania law. See, e.g., Kroblin Refrigerated Xpress, Inc. v. Pitterich , 805 F.2d 96, 107 (3d Cir. 1986) ("[W]here two writings are executed at the same time and are intertwined by the same subject matter, they should be construed together and interpreted as a whole, each one contributing to the ascertainment of the true intent of the parties." (citation omitted) ); Shehadi v. Ne. Nat'l Bank of Pa. , 474 Pa. 232, 378 A.2d 304, 306 (1977) ("It is a general rule of law that where one contract refers to and incorporates the provisions of another both shall be construed together." (citation and quotation marks omitted) ).
Accordingly, under principles of comity and collateral estoppel, Downey is precluded from re-litigating in this case the enforceability of the Confidentiality Agreement or its application to him.[39] See, e.g., Philadelphia Gear Corp. v. Philadelphia Gear de Mexico, S.A. , 44 F.3d 187, 191 (3d Cir. 1994) ("In general, '[u]nder the principle of international comity, a domestic court normally will give effect to executive, legislative, and judicial acts of a foreign nation.' " (quoting Remington Rand v. Bus. Sys. Inc. , 830 F.2d 1260, 1266 (3d Cir. 1987) ) ); Leo Feist, Inc. v. Debmar Publ'g Co., Inc. , 232 F. Supp. 623, 624 (E.D. Pa. 1964) ("In the case of foreign judgment there is as much reason to apply the doctrine of collateral estoppel to a fact litigated as to apply the doctrine of res judicata."); In re Christoff's Estate , 411 Pa. 419, 192 A.2d 737, 738-40 (1963) (applying principles of comity to recognize decree of Greek court).
3. Downey's Breach of Contract Claim Is Also Time-Barred
Even though the above findings are dispositive of Downey's breach of contract claim, we will address whether that claim would be timely if the alleged oral agreement were an enforceable contract supported by mutual consideration. Downey's breach of contract claim is subject to a four-year statute of limitations. See 42 Pa. Cons. Stat. Ann. § 5525(a)(3) (providing four-year limitation for actions "upon an express contract not founded upon an instrument in writing"). "[I]t is well-settled that the statute of limitations begins to run as soon as the right to institute and maintain a suit arises." Morgan v. Petrol. Prod. Equip. Co. , 92 A.3d 823, 828 (Pa. Super. Ct. 2014) (citing Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc. , 503 Pa. 80, 468 A.2d 468, 471 (1983) ). "In a contract case, the cause of action accrues when there is an existing right to sue based on the breach of contract." Cooper v. Sirota , 37 F. App'x 46, 48 (3d Cir. 2002) (citation omitted); see also *494 Christopher v. First Mut. Corp. , No. 05-01149, 2006 WL 166566, at *4 (E.D. Pa. Jan. 20, 2006) ("The failure of a party to a contract to perform in accordance with its terms gives the other party a cause of action for a breach." (citation omitted) ). The non-breaching party's "[m]istake, misunderstanding, or lack of knowledge in themselves do not toll the running of the limitations period." Morgan , 92 A.3d at 828 n.8 (citing Nesbitt v. Erie Coach Co. , 416 Pa. 89, 204 A.2d 473, 475 (1964) ).
Downey asserts that the alleged oral agreement was made in October 2001, when Dodge said Ecore would pay Downey "reasonable compensation" if he assigned the ISI invention to Ecore. Defendants' submissions-and the alleged agreement-are silent as to when this compensation was due, and there is no allegation, nor any evidence, that the alleged agreement provided for installment or periodic payments.[40] See Total Control, Inc. v. Danaher Corp. , 359 F. Supp. 2d 387, 391 (E.D. Pa. 2005) ("Under Pennsylvania law, where a contract calls for periodic or installment payments, a separate and distinct cause of action accrues with each failure to make payment."). Downey executed the Assignment on October 10, 2001, and his claim for breach of contract arguably arose at that time, when Ecore failed to concurrently pay, or make arrangements to pay, the allegedly promised compensation. See Packer Soc'v Hill Travel Agency, Inc. v. Presbyterian Univ, of Pa. Med. Ctr. , 430 Pa.Super. 625, 635 A.2d 649, 652-53 (1993) (finding that breach of contract claim becomes actionable when a party fails to make payments due under the agreement).
Alternatively, Ecore's breach of the alleged agreement was evident by January 2, 2002, when Dodge sent Downey an email confirming compensation terms for 2002 through 2004 that did not reference compensation for the Assignment. Subsequently, Ecore's breach, and Downey's knowledge of it, were confirmed in writing in early May 2005, when Downey wrote to Dodge: "My compensation was supposed to be designed to reflect additional remuneration for the impact sound patent I had assigned to DRI, which your proposal does not address." (Pl.'s SJ Ex. T.) Based on this undisputed evidence, Downey's claim for breach of the October 2001 "Agreement" had accrued, at the latest , by May 2, 2005. Downey did not assert his breach of contract counterclaim in this action until October 11, 2012, at least seven years, if not more than a decade, after his cause of action had accrued.
Downey argues that the statute of limitations was suspended under several tolling doctrines: (1) equitable tolling; (2) the discovery rule; (3) equitable estoppel; (4) the acknowledgement doctrine; and (5) the continuing contract doctrine. None of these doctrines applies.
First, the federal equitable tolling doctrine cited by Defendants does not apply to Downey's state law breach of contract claim.[41] Rather, Pennsylvania law *495 only recognizes equitable tolling "where either (1) the discovery rule applies or (2) the defendant is estopped from relying on the limitations period." Young v. Local 1201, Firemen & Oilers Union , No. 07-3576, 2009 WL 3152119, at *8 (E.D. Pa. Sept. 25, 2009), aff'd , 419 F. App'x 235 (3d Cir. 2011) ; see also Poole v. Marks , 441 F. App'x 854, 857 (3d Cir. 2011) (citing 42 Pa. Cons. Stat. § 5504 and discussing "the more lenient federal standard" for equitable tolling).
Second, the discovery rule does not apply because, here, no fact finder could reasonably conclude that for seven years after the alleged October 2001 "Agreement," Downey was unable, by the exercise of due diligence, to ascertain that Ecore had breached the agreement by failing to pay him the allegedly promised "reasonable compensation."[42] See Fine v. Checcio , 582 Pa. 253, 870 A.2d 850, 858-59 (2005) ("Where ... reasonable minds would not differ in finding that a party knew or should have known on the exercise of reasonable diligence of his injury and its cause, the court determines that the discovery rule does not apply as a matter of law." (citing Pocono Int'l Raceway , 468 A.2d at 471 ) ). On the contrary, the record unequivocally establishes that Downey was well aware of Ecore's failure to compensate him under the alleged oral agreement, and that he raised the issue with Ecore over a period of many years before he filed his breach of contract claim.[43] See Brawner v. Educ. Mgmt. Corp. , 513 F. App'x 148, 150-51 (3d Cir. 2013) (ruling that discovery rule did not toll statute of limitations where plaintiff "knew he was injured and made repeated inquiries of the various defendants, yet was apparently content to allow multiple years to pass between letters and responses").
Third, the evidence similarly precludes application of estoppel based on fraudulent concealment. This tolling doctrine "provides that the defendant may not invoke the statute of limitations, if through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts." Fine , 870 A.2d at 860. The party relying upon this doctrine "has the burden of proving fraudulent concealment by clear, precise, and convincing evidence." Id. Moreover, "a statute of limitations that is tolled by virtue of fraudulent concealment begins to run when the injured party knows or reasonably should know of his injury and its cause." Id. at 861 ; see also Bohus v. Beloff , 950 F.2d 919, 926 (3d Cir. 1991) ("[T]he Supreme Court [of Pennsylvania] views tolling the statute of limitations in terms of the 'knew or should have known' standard whether the statute is tolled because of the discovery rule or because of fraudulent *496 concealment." (citation and quotations omitted) ). As noted above, uncontested documentary evidence - including Downey's emails in May 2005 and May and November 2006 - establishes that he knew of his claim well outside the limitations period for a suit filed in 2012. In addition, even if we assume that for some period of time, Ecore's "assurances lulled" Downey into believing he would be separately compensated for the Assignment, that belief was objectively unreasonable, and Downey had actual knowledge of Ecore's breach by, at the latest , January 2008, when its Board of Directors rejected his demand for separate patent-related compensation. (Defs.' SJ Br. 39-40; Defs.' SJ Ex. W.) See Lang v. Continental Assurance Co. , 54 F. App'x. 72, 75 (3d Cir. 2002) (holding that insurer was not estopped from asserting statute of limitations where it told claimant he was not entitled to benefits); Perelman v. Adams , 945 F. Supp. 2d 607, 617 (E.D. Pa. 2013) (finding that assurances of payment would not toll the statute of limitations once plaintiff was on inquiry notice that payment had not been made).
Fourth, Ecore's alleged assurances that Downey would be reasonably compensated for the Assignment are far too uncertain and equivocal to trigger the acknowledgement doctrine. "Under [that] doctrine, the acknowledgment must 'be consistent with a promise to pay on demand and not accompanied by other expressions indicating a mere willingness to pay at a future time.' " Loeffler Thomas P.C. v. Fishman , No. 15-5194, 2016 WL 1457895, at *8 (E.D. Pa. Apr. 11, 2016) (quoting Raab v. Lander , 427 F. App'x 182, 187 (3d Cir. 2011) ). Ecore's alleged promises to pay Downey an unspecified amount at an unspecified future time do not represent the kind of unqualified promise to pay on demand that is necessary to invoke the acknowledgment doctrine. Id.
Finally, the alleged October 2001 "Agreement" was not a continuing contract because it did not provide for ongoing duties by either party. See Raab , 427 F. App'x at 185-86 (rejecting argument that a real estate investment agreement was a continuing contract). The record is devoid of evidence that the alleged agreement called for "installment payments or continuing contingencies" between the parties. Reese v. Tyler , No. 1769 MDA 2016, 2017 WL 3034502, at *4 (Pa. Super. Ct. July 18, 2017). Rather, under the agreement, as alleged by Downey, his duty was "to assign [his] rights in the '320 Application to [Ecore]," and Ecore's duty was to "reasonably compensate [Downey] for the invention and the assignment." (Downey 1/3/17 Decl. ¶ 8.) The continuing contract doctrine does not apply.
B. Downey's Quantum Meruit Claim (Countercl. II)
In the alternative to his breach of contract claim, and if the October 2001 "Agreement" is unenforceable, Downey asserts in Counterclaim II that he is entitled to quantum meruit/unjust enrichment relief in the form of rescission of the Assignment and disgorgement of Ecore's profits as they relate to the '723 and Reissued Patents. Ecore and Downey each seek summary judgment on Counterclaim IL Downey's unjust enrichment claim fails, and Ecore is entitled to summary judgment, for two reasons: (1) any claim for quantum meruit is foreclosed by the existence of the written contracts governing Ecore's and Downey's relationship; and (2) the claim is barred by the four-year statute of limitations.
Here, the parties' relationship, and Downey's obligation to assign the ISI invention, are governed by express, written *497 contracts - the Consulting and Confidentiality Agreements. "By its nature, the doctrine of quasicontract, or unjust enrichment, is inapplicable where a written or express contract exists." Lackner 892 A.2d at 34 ; see also Wilson Area Sch. Dist. v. Skepton , 586 Pa. 513, 895 A.2d 1250, 1254 (2006) ("[I]t has long been held in this Commonwealth that the doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract, regardless of how harsh the provisions of such contracts may seem in the light of subsequent happenings." (citations and internal quotation marks omitted) ). Neither party has challenged the validity of the Consulting Agreement; on the contrary, each has recognized its validity by asserting a claim against the other for breach of that agreement. Furthermore, Defendants have not expressly attacked the validity of the Confidentiality Agreement, and we have rejected their arguments that it was superseded or is not binding as to Downey. Because Downey's compensation and the parties' rights with respect to the ISI invention are governed by written agreements, Downey cannot maintain his claim for quantum meruit relief.
Even if Downey's quantum meruit claim were cognizable, it would nevertheless be barred because Downey did not assert it within Pennsylvania's four-year statute of limitations for contracts. See 42 Pa. C.S.A. §§ 5525(a)(4) (providing 4-year statute of limitation for an action upon a contract implied in law); Sevast v. Kakouras , 591 Pa. 44, 915 A.2d 1147, 1153 (2007) (stating that four-year statute of limitation applies to unjust enrichment claim). The above analysis of the statute of limitations and tolling doctrines applies equally to Downey's quantum meruit claim, which, like his breach of contract claim, is time-barred.
Summary judgment will be granted in favor of Ecore as to Counterclaim II.
C. CSR's Breach of Contract and Quantum Meruit Claims (Countercls. III, IV)
Counterclaim III alleges that Ecore breached the Consulting Agreement by failing to fully pay CSR the bonuses due under that agreement. Specifically, Defendants allege that Ecore has not paid CSR its incentive bonuses for 2011 or July through December 2010. According to Defendants, the unpaid incentive bonuses total $124,443.52, exclusive of interest. In Count IV, CSR asserts, in the alternative, a quantum meruit /unjust enrichment claim with regard to the unpaid bonuses. Defendants seek summary judgment as to Counterclaim III, and both Defendants and Ecore seek summary judgment as to Counterclaim IV. For the reasons that follow, Defendants' Motion will be denied as to CSR's breach of contract claim, and summary judgment will be granted in favor of Ecore and against Defendants as to CSR's quantum meruit claim.
With regard to CSR's breach of contract claim, Ecore first argues that because Downey and CSR materially breached the Consulting Agreement by disclosing Ecore's Proprietary Information to Pliteq, Ecore has no duty to pay CSR under the agreement. Ecore is correct that if Defendants materially breached the parties' agreements, that breach may excuse Ecore's payment obligation and preclude CSR's breach of contract claim. See LJL Transp., Inc. v. Pilot Air Freight Corp. , 599 Pa. 546, 962 A.2d 639, 648 (2009). However, as is discussed below, there is conflicting evidence regarding whether Ecore knew about and approved of Downey's and CSR's activities through Pliteq. Because factual disputes exist regarding Defendants' potential material breach, *498 which, if established, may relieve Ecore of any obligation to pay CSR, summary judgment is not appropriate as to Counterclaim III at this juncture.
Ecore also argues that material factual disputes exist regarding the amount of bonus compensation, if any, that is owed to CSR. We agree. As evidence of the amounts allegedly owed, Defendants offer: (1) an undated Ecore summary of the monthly incentive bonus calculation from 2003 through June 2011, with a notation stating that the 2011 incentive bonus was not paid; and (2) a compilation of canceled checks paid by Ecore to Downey between February 2005 and July 2010, with no notations identifying the bonus periods to which the checks correspond. (Defs.' SJ Exs. X, Y.) Based on Defendants' interpretation of these documents, the amounts allegedly owed are "undisputed" and admitted by Ecore. (Defs.' SJ Br. 33-34; Defs.' SJ Reply 20-21.) Ecore, however, argues that the same documents "reflect that Downey and CSR were overpaid ... in 2010." (Ecore SJ Opp. 26.) With only these two exhibits and the parties' conflicting interpretations of them, we cannot tell what, if any, bonus amount remains unpaid, and we will not scour the record further to find evidence that might answer that question. Doeblers' Pa. Hybrids, Inc. v. Doebler , 442 F.3d 812, 820 n. 8 (3d Cir. 2006) ("As noted by the Seventh Circuit, 'Judges are not like pigs, hunting for truffles buried in the record.' " (citations and internal quotation marks omitted) ). Defendants' Motion for Summary Judgment will be denied as to Counterclaim III.
Turning to CSR's quantum meruit claim, it is precluded by the existence of the written Consulting and Confidentiality Agreements governing the parties' relationship. See, e.g., Lackner 892 A.2d at 34 ("By its nature, the doctrine of quasicontract, or unjust enrichment, is inapplicable where a written or express contract exists."). Defendants contend that CSR can maintain its quantum meruit claim in the alternative because, according to Defendants, "the parties dispute the legal effect and scope of [the] contract." (Defs.' SJ Opp. 44.) According to Defendants, "Ecore still disputes the existence of a contract that requires it to pay CSR 12% of Ecore's SVBU operating profits." (Defs.' SJ Opp. 44.) Even assuming that Defendants have accurately characterized Ecore's position, it is immaterial because we have already found it to be undisputed that as of 2007, the CSR/Downey "bonus comp [was] 12% of Business Unit operating profit."[44] (Defs.' SJ Ex. W.) Because there is no genuine issue of material fact regarding the existence, validity, or scope of the Consulting and Confidentiality Agreements, and because CSR's relationship with Ecore was founded upon those express contracts, summary judgment will be granted in favor of Ecore as to CSR's quantum meruit claim.
D. Downey's and CSR's Promissory Estoppel Claim (Countercl. V)
In Counterclaim V, Downey and CSR assert a claim for promissory estoppel based on Ecore's alleged failure to compensate Downey for the ISI invention and *499 Assignment and its alleged failure to fully pay the bonus compensation owed to CSR.
Under Pennsylvania law, "an enforceable contract between two parties precludes relief for a claim of promissory estoppel," Isobunkers, L.L.C. v. Easton Coach Co. , No. 09-879, 2010 WL 547518, at *4 (E.D. Pa. Feb. 9, 2010) (citing Carlson v. Arnot-Ogden Mem'l. Hosp. , 918 F.2d 411, 416 (3d Cir. 1990) ("In light of our finding that the parties formed an enforceable contract, relief under a promissory estoppel claim is unwarranted.") ). Courts have reserved promissory estoppel "for situations 'where the formal requirements of contract formation' have failed." Carlson , 918 F.2d at 416. "When an express contract exists ... the parties' recovery is limited to the measures provided in the contract." Hershey Foods Corp. v. Ralph Chapek, Inc. , 828 F.2d 989, 999 (3d Cir. 1987) (citing Murphy v. Haws & Burke , 235 Pa.Super. 484, 344 A.2d 543 (1975) ).
As we have already determined, the Consulting and Confidentiality Agreements are valid and enforceable contracts that govern Ecore's relationship with Downey and CSR, including Ecore's alleged obligation to pay the compensation that is the subject of these Counterclaims. The existence of these contracts precludes relief through a claim of promissory estoppel. Accordingly, Ecore's Motion for Summary Judgment will be granted as to Counterclaim V.
E. Downey's and CSR's Fraudulent Inducement Claim (Countercl. VI)
In Counterclaim VI, Downey and CSR essentially recast their breach of contract claims as ones for fraudulent inducement based on Ecore's and Dodge's alleged misrepresentation of their intent to comply with the parties' agreements. Specifically, Defendants allege that Ecore and Dodge "misrepresented to Downey that they would provide Downey reasonable compensation if Downey would assign to Ecore his rights in the [ISI] invention and Patents," (Answ. & Countercl. ¶ 141), and "misrepresented to CSR that Ecore would pay to CSR an annual bonus payment of 12% of Ecore's Sound and Vibration Business Unit's operating profit." (Id. ¶ 142.) Ecore argues that Defendants' fraudulent inducement claims are barred by the gist of the action doctrine. Ecore further argues that Downey's fraudulent inducement claim is barred by the applicable statute of limitations.[45] We agree.
"Pennsylvania's gist of the action doctrine 'bars claims for allegedly tortious conduct where the gist of the conduct sounds in contract rather than tort.' " Quandry Sols., Inc. v. Verifone Inc. , 2007 WL 655606, at *2 (quoting Hospicomm v. Fleet Bank, N.A. , 338 F. Supp. 2d 578, 582 (E.D. Pa. 2004) ). "The purpose of the doctrine is to 'preclud[e] plaintiffs from re-casting ordinary breach of contract claims into tort claims.' " Id. (quoting eToll v. Elias/Savion Advertising, Inc. , 811 A.2d 10,14 (Pa. Super. Ct. 2002) ; see also Quandry , 2007 WL 655606, at *3 (holding that gist of action doctrine bars claims that are inextricably intertwined with promises to perform under contract); Galdieri v. Monsanto Co. , 245 F. Supp. 2d 636, 651 (E.D. Pa. 2002) (holding that "breach of contract claim cannot be 'bootstrapped' into a fraud claim merely by adding the words 'fraudulently *500 induced' or alleging the contracting parties never intended to perform.").
To determine whether a fraud claim is barred by the gist of the action doctrine, "the Court must first assess the alleged breach of the 'social duty imposed by the law of torts' (i.e., the fraud)," and then compare that breach to Ecore's contractual obligations under the parties' agreements. SodexoMAGIC , 2018 WL 3659241, at *18 (quoting Bruno v. Erie Ins. Co. , 630 Pa. 79, 106 A.3d 48, 70 (2014) ). Where "the 'nature of the duty' alleged to be violated arises out of Defendants' contractual promises," the gist of the action doctrine bars the fraud claim. Downs v. Andrews , 639 F. App'x 816, 821 (3d Cir. 2016) (quoting Bruno , 106 A.3d at 68 ). In Bruno , the court stated the following "general governing principle which can be derived from our prior cases":
[O]ur Court has consistently regarded the nature of the duty alleged to have been breached, as established by the underlying averments supporting the claim in a plaintiff's complaint, to be the critical determinative factor in determining whether the claim is truly one in tort, or for breach of contract.... If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract - i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract - then the claim is to be viewed as one for breach of contract. If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort.
Bruno , 106 A.3d at 68 (2014) (citations omitted). Courts applying the gist of the action doctrine "have barred fraud claims: (1) which arise solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim." SodexoMAGIC , 2018 WL 3659241, at *18.
The principles summarized above confirm that the gist of the action doctrine bars Defendants' fraudulent inducement claims. The claims duplicate Defendants' breach of contract claims and, in fact, rest on identical factual allegations. Moreover, the duties Ecore and Dodge allegedly breached were created by, grounded in, and would not exist but for the contractual obligations imposed by the Consulting and Confidentiality Agreements. But for those agreements, Downey would have had no duty to assign the ISI invention to Ecore, and Ecore would have had no duty to compensate Downey for the invention. The breach of duty underpinning Downey's fraudulent inducement claim "stems from [the] contract[s]," and "is derived from" the parties' dispute about whether Downey's compensation under the Consulting Agreement adequately accounted for the value of his contributions to Ecore. SodexoMAGIC , 2018 WL 3659241, at *19. Similarly, CSR's entitlement to bonus compensation, Ecore's obligation to pay it, and Ecore's alleged liability for unpaid compensation, arise solely from the parties' written agreements. Accordingly, summary judgment will be granted in favor of Ecore with respect to Counterclaim VI.
F. Pliteq's Tortious Interference Claims (Countercl. (VII, VIII)
In Counterclaims VII and VIII, Pliteq asserts claims against Ecore and Dodge for tortious inference with contractual and prospective contractual relations. Ecore *501 seeks summary judgment as to both claims, arguing that Pliteq has not identified sufficient evidence to support each element of those claims. For the reasons that follow, summary judgment will be granted in favor of Ecore as to Pliteq's tortious interference claims.
Pennsylvania recognizes both interference with existing contractual relations and interference with prospective contractual relations as branches of the tort of interference with a contract. See U.S. Healthcare, Inc. v. Blue Cross of Greater Phila. , 898 F.2d 914, 925 (3d Cir. 1990). "While the two branches of tortious interference are distinct, they share essentially the same elements." Brokerage Concepts, Inc. v. U.S. Healthcare, Inc. , 140 F.3d 494, 529 (3d Cir. 1998). A claim for intentional interference with contractual or prospective contractual relations requires proof of:
(1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party;
(2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring;
(3) the absence of privilege or justification on the part of the defendant;
(4) legal damage to the plaintiff as a result of defendant's conduct; and
(5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference.
Id.
Defendants contend that after Ecore terminated the Consulting Agreement, Dodge and Ecore executive Laura Dodge made disparaging statements about Downey and Pliteq to others in the industry, including Pliteq's customers and potential customers, and that Ecore caused Pliteq to lose sales by explicitly or implicitly threatening that Pliteq's customers would be embroiled in litigation if they did business with Pliteq. (Downey 8/30/16 Dep. 101-18; Defs.' SJ Opp. Exs. 16, 18-25 35.)[46] Defendants also assert that Ecore employee Sharon Paley made statements directed to people in the industry that were misrepresentations about Pliteq and its products. (Paley Dep. 75-79, 90-92, 100, 104-09, 150-53, 239-42, 246-49, Defs.' SJ Opp. Ex. 38; Defs.' SJ Exs. 39, 40-42.) Defendants assert that the above-described conduct constituted tortious interference with Pliteq's existing or prospective business relationships. Defendants identify fourteen companies that it claims were targets of Ecore's tortious interference.[47] Ecore does not specifically dispute that the alleged statements were made. However, it argues that it is entitled to summary judgment because Pliteq has not identified sufficient evidence to support each element of its tortious interference claims.[48]
*502 As a threshold matter, Defendants appear to concede that Ecore is entitled to summary judgment as to the alleged interference with ten of the fourteen companies. (See Defs.' SJ Opp. 57 (stating that the "tortious interference claims should not be dismissed with respect to ... Sound Isolation Store, Century Tile, DalTile, and Marjam").) Defendants' opposition focuses on those four companies and does not specify the nature of the other ten companies' relationships with Pliteq, or when or how those relationships were affected. Moreover, Defendants do not explain how the evidence they cite could satisfy any of the elements of tortious interference as to the ten companies. See DeShields v. Int'l Resort Properties Ltd. , 463 F. App'x 117, 120 (3d Cir. 2012) (noting that if factual support exists in the record, it is incumbent upon the party opposing summary judgment to direct the court's attention to those facts). Accordingly, Ecore is entitled to summary judgment as to alleged interference targeting Aura Seaside, Boca Lofts, Broadstone Harbor Beach, CAC Development, Circle Floors, Direct Flooring, JJ Haines/Ram Flooring, Jacobsen Construction, Met Lumber, and Via Mizner.
With regard to the four companies discussed in the parties' briefs: Sound Isolation Store, Century Tile, DalTile, and Marjam, the record indicates that these four companies were existing or potential customers of Pliteq's. Therefore, the first element of a tortious interference claim is satisfied for purposes of the current Motion. To establish the second and third elements, Defendants must identify evidence from which a jury could find that Ecore acted purposefully with the intent to harm Pliteq's contractual relationships, and that Ecore was not privileged or justified in its interference. See Synthes, Inc. v. Emerge Med., Inc. , No. 11-1566, 2014 WL 2616824, at *21 (E.D. Pa. June 11, 2014) ("A party alleging tortious intereference 'must show that the defendant acted for the malevolent purpose of interfering with the plaintiff's existing or prospective business relationships."); Audi of Am., Inc. v. Bronsberg & Hughes Pontiac, Inc. , 321 F. Supp. 3d 503, 518 (M.D. Pa. 2018) ("The burden of proving the absence of any privilege or justification is on the plaintiff.").
Regarding the four business relationships at issue, Defendants assert that: (1) Sound Isolation Store stopped buying from Pliteq after Ecore's "repeated veiled threats" that Sound Isolation Store would be "caught-up in" the parties' litigation if it remained a Pliteq customer;[49] (2) Century Tile informed Pliteq that it would no longer consider purchasing its products after receiving a letter from Ecore advising it of Ecore's litigation against Pliteq; (3) after learning of Ecore's claims against Pliteq, DalTile wanted an indemnification agreement in order to continue doing business with Pliteq; and (4) "after months of Ecore peppering Marjam's customers with propaganda about Pliteq, Marjam began selling Ecore product instead of Pliteq product." (Defs.' SJ Opp. 58-59.) Assuming that the evidence cited in support of Pliteq's claims is capable of admission at trial, and construing that evidence in the light most favorable to Pliteq, it is sufficient to support an inference that Ecore acted with the requisite intent.[50] See *503 Geyer v. Steinbronn , 351 Pa.Super. 536, 506 A.2d 901, 910 (1986) (explaining that a jury is often "called upon to draw an inference from circumstantial evidence" regarding whether the requisite intent existed).
However, Defendants' evidence falls well short with respect to the third element of Pliteq's claim. In order to get past Ecore's Motion, Defendants must identify evidence from which a reasonable fact finder could conclude that Ecore's alleged interference "was not privileged or justified." Audi of Am. , 321 F. Supp. 3d at 518 (citation and internal quotation omitted); see also Synthes , 2014 WL 2616824, at * 19 (" 'the absence of privilege is an element of the cause of action which must be pleaded and proved by the plaintiff' " (quoting Bahleda v. Hankison Corp. , 228 Pa.Super. 153, 323 A.2d 121, 122-23 (1974) ) ). Although what is proper conduct in a given situation is not capable of being precisely defined, the central inquiry is whether the defendant's conduct is "sanctioned by the rules of the game which society has adopted." Adler, Barish, Daniels, Levin & Creskoff v. Epstein , 482 Pa. 416, 393 A.2d 1175, 1184 (1978) (citation and internal quotation omitted).
In assessing whether a defendant's conduct is privileged or improper, courts applying Pennsylvania law consider the factors outlined in the Restatement (Second) of Torts. See Adler, Barish , 393 A.2d at 1184 (adopting Restatement § 767); Acumed LLC v. Advanced Surgical Servs., Inc. , 561 F.3d 199, 215 (3d Cir. 2009) (noting that Pennsylvania has adopted Restatement section 768). These factors include: "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties." Restatement (Second) of Torts § 767 (1979). Where the defendant is a competitor of the plaintiff, the Restatement advises:
(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
(a) the relation concerns a matter involved in the competition between the actor and the other and
(b) the actor does not employ wrongful means and
(c) his action does not create or continue an unlawful restraint of trade and
(d) his purpose is at least in part to advance his interest in competing with the other.
(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.
Id. § 768; see also *504 Windsor Sec., Inc. v. Hartford Life Ins. Co. , 986 F.2d 655, 665 (3d Cir. 1993) ("Our cases accord substantial deference to defendants whose conduct, despite its conflict with plaintiff's interest, protects an existing legitimate business concern."). The comments to Section 768 further note that:
One's privilege to engage in business and to compete with others implies a privilege to induce third persons to do their business with him rather than with his competitors. In order not to hamper competition unduly, the rule stated in this Section entitles one not only to seek to divert business from his competitors generally but also from a particular competitor. And he may seek to do so directly by express inducement as well as indirectly by attractive offers of his own goods or services.
* * *
If the actor employs wrongful means, he is not justified under the rule stated in this Section. The predatory means discussed in § 767, Comment c, physical violence, fraud, civil suits and criminal prosecutions, are all wrongful in the situation covered by this Section. On the other hand, the actor may use persuasion and he may exert limited economic pressure. Subject to Clause (c) (see Comment f), he may refuse to deal with the third persons in the business in which he competes with the competitor if they deal with the competitor. Or he may refuse other business transactions with the third person relating to that business.
Id. cmts. b, e (emphasis added).
Applying these principles, the evidence cited by Defendants is insufficient to permit a finding that Ecore's actions were improper. For example, the evidence as to Sound Isolation Store indicates only that Dodge apparently left a voicemail for someone at that company in which he said that Ecore had filed a lawsuit against Pliteq "for a number of things including interfering with our business, stealing our patents, and just doing a bunch of bad things." (Defs.' SJ Exs. 16, 18, 19; see also Downey 8/30/16 Dep. 110.) The message then stated: "We're sure you're not aware of that, we just want to have a conversation with you about it, try to get this thing resolved in an amicable way...." (Id. ) As to Century Tile, Defendants rely upon an email, apparently from someone at Century Tile to John Freidkes, stating: "We have a letter indicating a pending law suit between your company and the QT4005 people. At this time your material is not being considered. Once you get in give a call and we can discuss. Sorry to [bear] the bad news." (Defs.' SJ Ex. 35.) As to DalTile and Marjam, the evidence cited by Defendants is even more sparse and consists only of (1) Downey's hearsay statement that "DalTile stopped buying from Pliteq" and "wanted an indemnity against a lawsuit" after Dodge "call[ed] DalTile and threaten[ed] litigation," (Downey 8/30/16 Dep. 112-113); (2) a vague and unexplained email from Marjam's product manager to Downey and Friedkes, (Defs.' SJ Ex. 37); and (3) Downey's unsubstantiated assertion that Ecore's interference with respect to Marjam is one of the causes of Marjam's lawsuit against Pliteq. (Downey 8/30/16 Dep. 165-66.)
Even drawing all inferences in Pliteq's favor, there is no genuine dispute of material fact regarding whether Ecore lacked privilege or justification for its alleged actions. Defendants have identified no evidence that Ecore employed the "predatory" means outlined in the Restatement. On the contrary, the record reveals, at most, that Ecore responded to what it perceived as improper conduct by Pliteq, informed customers of the parties' legal dispute, and tried to persuade customers to do business with Ecore rather than Pliteq. These are *505 permissible competitive actions under the circumstances here, where Ecore and Pliteq "were competitors and the [actions] directly concerned relations involved in the competing business and not some affair unrelated to their competition." Synthes , 2014 WL 2616824, at *23 ; see also Audi of Am. , 321 F.Supp.3d at 519 ("[A]n actor is privileged to interfere with another's performance of a contract when: (1) the actor has a legally protected interest; (2) he acts or threatens to act to protect the interest; and (3) the threat is to protect it by proper means." (citation and quotation omitted) ). Because no reasonable factfinder could conclude that Ecore tortiously interfered with Pliteq's business, summary judgment will be granted in favor of Ecore as to Counterclaims VII and VIII.
G. Ownership Issue Of Pliteq's False Marketing Claim (Countercl. XIV)
In Counterclaim XIV, Pliteq asserts a claim of false marketing, alleging that Ecore falsely represented that "it owns pending patent(s) with claims that cover the QTrbm product," when, according to Pliteq, "Ecore does not own any pending and/or issued patent(s) with claims that cover the QTrbm product." (Answ. & Countercl. ¶ 217.) Ecore seeks summary judgment that it is the owner of the patent that ultimately issued for the QTrbm product-the '430 Patent. Ecore asserts that because it filed the original application for the NVMM invention/QTrbm product, it is the owner of the patents that ultimately issued. Ecore further argues that "because this invention 'relates to' Ecore's Proprietary Information," it is Ecore's exclusive property. (Pl.'s SJ Br. 33.)
Ecore has cited to no authority for its conclusory assertion that the initial filer of a patent application is, under all circumstances, the owner of whatever patent ultimately issues from that application, even if the initial filer may have abandoned its application. Moreover, as noted in the Factual Background above, material factual disputes exist regarding whether Ecore abandoned the applications that ultimately led to the NVMM invention patents. Finally, Ecore has identified no evidence from which a fact finder could conclude that the NVMM invention relates to Ecore's Proprietary Information. The record reflects only that Downey developed the NVMM invention while working at Ecore. Plaintiff has not identified any evidence that Downey's development of this invention relied upon Ecore's "technology, know-how, plans, designs, specifications, formulas, drawings, [or] other information related to [Ecore's] products, production equipment, [or] manufacturing processes." (Confidentiality Agmt. § 1(a).) Ecore's Motion will be denied as to Counterclaim XIV.
H. Ecore's Breach of Contract Claim (Count IV)
Ecore asserts that it is entitled to summary judgment on its breach of contract claim against Downey, because (1) Downey disclosed Ecore's proprietary information to Pliteq; and (2) Downey impermissibly retained Ecore's Proprietary Information once the Confidentiality Agreement was terminated. We address each alleged breach in turn.
1. Disclosure of Proprietary Information to Pliteq
Regarding the disclosure of Ecore's proprietary information to Pliteq, Defendants' primary argument is that Dodge knew of and approved the disclosure as part of its agreement allowing Pliteq to market and sell a private label version of Ecore's QT product. Defendants rely on Dodge's response to the email chain Downey forwarded to him on September *506 28, 2010, and on Downey's and John Freidkes' testimony regarding Dodge's alleged approval of Pliteq's private label activities. Ecore counters this evidence with Dodge's testimony that he never read the relevant part of the forwarded emails, and that he first learned of Pliteq's existence in July 2011. Ecore also cites to other email communications indicating that Ecore did not learn of Downey's and Pliteq's private label activities until 2011, at which point it immediately terminated its relationship with Downey and CSR.
Defendants do not dispute that Downey and CSR disclosed Ecore's Proprietary Information to Pliteq. However, the conflicting evidence recounted in detail in the Factual Background reflects a material factual dispute as to whether Ecore gave its approval for Downey's and CSR's actions with respect to Pliteq. In the Re-labeling Case, the court denied Ecore's motion for summary judgment after considering essentially the same evidence and arguments that are before us here. In so ruling, the court concluded: "Given the highly factual nature of the parties' contentions regarding what the [September 2010] email [chain] meant, whether Dodge even read it, and whether the parties' conduct corroborates the existence of the agreement, the alleged agreement to engage in relabeling is properly a matter for the jury to assess." Ecore Int'l, Inc. v. Downey , No. 12-2729, 2015 WL 127316, at *3 (E.D. Pa. Jan. 7, 2015). We reach the same conclusion and will deny Ecore's Motion to the extent that it relates to the disclosure of Ecore's Proprietary Information.
2. Retention of Ecore Proprietary Information
During its review of Defendants' document production, Ecore identified the following Proprietary Information retained by Downey: Ecore's customer lists; Ecore's market analysis for 2001, 2005, and 2006; Ecore's 2004 Budget and Business Outlook for the South and Vibration Business Unit; Sound and Vibration Business Unit's Financial History for 2003-2004; 2005 budget; financial information relating to the amounts Ecore paid to marketing companies; and Ecore's business Unit Analysis (including standard gross margin and expenses) for Q4 2009, Q1 2006, Q1 2007, Q2 2009, Q4 2009, Q2 2010, and Q4 2010. (Pl.'s SJ Ex. X.)[51]
Downey does not dispute that he retained Ecore's proprietary information. Instead, Downey contends that he was permitted to safeguard the documents while preparing for the instant litigation. According to Downey, the obligation to preserve evidence supersedes a contractual agreement between the parties to return or destroy documents. This argument fails under relevant case law. Courts in this circuit have held that parties should seek to obtain necessary documents for pending or anticipated litigation through the discovery process. See, e.g., Bell v. Lockheed Martin Corp. , No. 08-6292, 2010 WL 11450407, at *5 (D.N.J. June 30, 2010) (requiring plaintiff-employee who retained documents and information belonging to defendant-employer to return documents and seek them through formal discovery, despite plaintiff-employee's argument that documents and information were retained for purposes of litigation). Downey's argument *507 that he was avoiding spoliation by retaining Ecore's Proprietary Information in anticipation of litigation is insufficient to justify his breach of the Confidentiality Agreement. The express terms of that agreement required the return of Proprietary Information; Downey did not have the obligation or the option to destroy such information. Therefore, compliance with the agreement did not implicate a spoliation concern.
Because Downey breached the Confidentiality Agreement in this respect, summary judgment will be granted in part to Ecore as to Downey's liability for retaining Ecore's Proprietary Information. Determination of whether and to what extent this breach entitles Ecore to recover nominal or other damages and attorneys' fees and costs will be deferred until the damages phase of the trial.
I. The Altered Test Report Portions of Ecore's Lanham Act Claim (Count I)
As part of its Lanham Act claim, Ecore alleges that Defendants improperly altered Ecore's 2008 and 2009 test reports to make it appear that the reports pertained to Pliteq products. Defendants argue that with respect to these allegations, Ecore's Lanham Act claim is barred by res judicata , since it arose "out of the same facts and series of transactions as Ecore's claims in the [Re-labeling Case] relating to Pliteq allegedly 'replac[ing] the Plaintiff's [Ecore's] labels with those of Pliteq' in connection with private label sales." We agree.
For res judicata to apply three elements must be present: "(1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same cause of action." Davis v. Wells Fargo , 824 F.3d 333, 341 (3d Cir. 2016) (quoting Lubrizol Corp. v. Exxon Corp. , 929 F.2d 960, 963 (3d Cir. 1991) ). "If these three factors are present, a claim that was or could have been raised previously must be dismissed as precluded." Shih-Liang Chen v. Township of Fairfield , 354 F. App'x 656, 658 (3d Cir. 2009) (quoting CoreStates Bank, N.A. v. Huls America, Inc. , 176 F.3d 187, 194 (3d Cir. 1999) ). Indeed, res judicata "bars not only claims that were brought in a previous action, but also claims that could have been brought." Davis , 824 F.3d at 342 (quoting In re Mullarkey , 536 F.3d 215, 225 (3d Cir. 2008) ); D'Orazio v. Hartford Underwriters Ins. Co. , No. 11-7443, 2012 WL 2327766, at *2 (E.D. Pa. June 19, 2012) ; In re Montgomery Ward , 634 F.3d 732, 736-37 (3d Cir. 2011) ). Res judicata bars a claim that "arises from the same set of facts as a claim adjudicated on the merits in the earlier litigation." Blunt v. Lower Merion Sch. Dist. , 767 F.3d 247, 277 (3d Cir. 2014). The Third Circuit "take[s] a broad view of what constitutes the same cause of action and ... res judicata generally is thought to turn on the essential similarity of the underlying events giving rise to the various legal claims." Blunt , 767 F.3d at 277 (internal quotation and editorial marks omitted). "In short, the focus is on facts rather than legal theories." Davis , 824 F.3d at 342 ; Elkadrawy v. Vanguard Grp. , 584 F.3d 169, 173 (3d Cir. 2009) (noting that the "analysis does not depend on the specific legal theory invoked").
All three elements of res judicata exist with respect to the portions of Ecore's Lanham Act claim that are based on alleged alteration of product test reports. First, the parties' July 2, 2015 Agreement was a final judgment on the merits. The Agreement provided for the dismissal with prejudice of "all Claims asserted in the Action, including the Remaining Claims," (July 2, 2015 Agmt. 2.) The *508 corresponding Joint Stipulation of Dismissal With Prejudice finally disposed of "all claims and causes of action arising in the above-styled action." (Re-labeling Case, ECF No. 82.) "A judgment entered with prejudice pursuant to a settlement is a final judgment on the merits for the purposes of res judicata." Guiles v. Metro. Life Ins. Co. , No. 00-5029, 2001 WL 1454041, at *1 (E.D. Pa. Nov. 13, 2001) (citing Langton v. Hogan , 71 F.3d 930, 935 (1st Cir. 1995) ); RFF Family P'ship, LP v. Ross , 814 F.3d 520, 532 (1st Cir. 2016).
Second, the claims involve the same parties or their privies. The fact that Ecore sued Downey and CSR in this case, rather than Downey and Pliteq, is immaterial because CSR is clearly in privity with Downey. Third, Ecore's Lanham Act allegations relating to the 2008 and 2009 test reports could have been brought in the Re-labeling Case. Specifically, the allegations at issue here and the claims asserted in the Re-labeling Case both relate to Pilteq's and Downey's actions in changing product information to make it appear that Ecore's products were Pliteq's. Ecore was aware of the facts relating to the altered test reports at the time it settled and stipulated to the dismissal of the Re-labeling Case, yet Ecore did not allege those facts until July 14, 2015, in its Amended Complaint in this action. Finally, and contrary to Ecore's argument, our res judicata analysis is not affected by the Re-labeling Case settlement carve-out for "claims and counterclaims pending" in Case No. 11-6843. (July 2, 2015 Agmt. ¶ 3.) Ecore's allegations regarding test report alterations were first asserted in this case on July 14, 2015 and, thus, were not pending in this case at the time the Re-labeling Case was settled effective July 2, 2015, and dismissed with prejudice on July 7, 2015.
Summary judgment will be granted in favor of Defendants as to the portions of Count I that are based on the alleged alteration of product test reports.
J. Ecore's Conversion Claim (Case No. 16-1993, Count I)
Ecore's Complaint in Case No. 16-1993 asserts a claim against Downey for conversion of the intellectual property underlying the '029 Patent. Ecore alleges that it is the rightful owner of the intellectual property underlying the '029 Patent, and that Downey wrongfully sought and obtained the '029 Patent without legal justification and without Ecore's consent. (Am. Compl. ¶¶ 27-28, 30-34.) Ecore further alleges that it had no knowledge of the '029 Patent until Defendants filed their Answer and Counterclaims to the Amended Complaint in Case No. 11-6843. (Id. ¶¶ 24-26, 35.)
Defendants seek summary judgment as to Ecore's conversion claim on two grounds. Defendants argue that the claim is barred by waiver/estoppel because Ecore allegedly abandoned the previous applications for the NVMM invention. Defendants also contend that Ecore's claim is barred by the two-year statute of limitations. According to Defendants, Ecore knew of the '029 Patent by late 2013 or early 2014, "when Ecore's counsel was monitoring Pliteq's website and product brochures, both of which highlighted the '029 Patent." (Defs.' SJ Br. 39.)
Once again, material factual disputes exist regarding whether Ecore abandoned the applications that ultimately led to the '029 and '430 Patents for the NVMM invention. Factual disputes also preclude summary judgment regarding the statute of limitations. Defendants' argument on that issue is based on an email from Ecore's counsel reflecting that she had reviewed certain marketing materials on Pliteq's website related to its FF product, and on a printout from the "news" section of Pliteq's website that includes, *509 among approximately 50 entries, an announcement of the '029 Patent's issuance. Defendants made the same argument, citing the same evidence, in their Motion to Dismiss Ecore's claims in Case No. 16-1993. In denying that Motion, we noted that "Defendants' exhibits show, at most, that disputed issues of fact exist regarding when Ecore knew or should have known of the '029 Patent." (ECF No. 132 (citing Farm Credit Leasing Servs. Corp. v. Ferguson Packaging Mach., Inc. , No. 07-1900, 2007 WL 4276841, at *3-4 (E.D. Pa. Dec. 3, 2007).) With no additional evidence offered on this issue, we reach the same conclusion now.
IV. CONCLUSION
For the foregoing reasons, Ecore's Motion for Summary Judgment will be granted in part and denied in part as follows: Ecore's motion will be granted as to Defendants' Counterclaims I, II, IV, V, VI, VII, and VIII; it will be granted in part as to Ecore's Count IV; and it will be denied as to Counterclaim XIV.
Defendants' Motion for Summary Judgment will be granted as to the portions of Ecore's Count I that are based on the alleged modification of product test reports, and it will be denied in all other respects.
An appropriate order follows.

The Confidentiality Agreement also included the following forum selection/choice of law provision:
Employee hereby consents to the exclusive jurisdiction in the courts of the Commonwealth of Pennsylvania and of the United States situate in the Commonwealth of Pennsylvania, in connection with any action or suit to enforce this Agreement, that relates to this Agreement, that arises out of or in any way relates to the Company's business relations with Employee. Employee hereby irrevocably waives any defense on jurisdiction or venue grounds or any other objection to such jurisdiction and agrees that any litigation or suit involving any such dispute shall take place exclusively in the courts of the Commonwealth of Pennsylvania or of the United States situate in the Commonwealth of Pennsylvania. The terms and conditions set forth in this Agreement shall be governed by, and construed in accordance with, the domestic internal laws of the Commonwealth of Pennsylvania, without regard to its principles pertaining to conflict of laws....
(Confidentiality Agmt. § 3.)

Excerpts of Downey's June 27, 2007 deposition testimony in Dodge Regupol, Inc. v. RB Rubber Prods., Inc. , No. 6-236 (D. Mo.), are attached to Plaintiff's submissions as: Pl.'s SJ Ex. H; and Pl.'s SJ Opp. Ex. I.

Downey's April 24, 2008 deposition testimony was taken in the case of Dodge-Regupol, Inc. v. RB Rubber Prods., Inc. , No. 06-236 (M.D. Pa.).

Downey testified that regrind is "like a post industrial waste, so it's a waste that's generated in the factory that's then instead of sent to [a] landfill, it's actually reused." (Downey 4/1/11 Dep. 154.)

Ecore subsequently filed a Canadian patent application for the ISI invention, resulting in the issuance of Canadian Patent No. 2,398,262 on September 28, 2010. (Defs.' SJ Ex. H.)

The Assignment is attached to the parties' submissions as: Pl.'s SJ Ex. K, Defs.' SJ Ex. F, and Pl.'s SJ Opp. Ex. K.

As is discussed infra , the parties offer conflicting accounts of the circumstances surrounding the Assignment and Downey's claimed entitlement to separate compensation for the ISI invention.

The '723 Patent is attached to the parties' submissions as: Pl.'s SJ Ex. J, Defs.' SJ Ex. G, and Pl.'s SJ Opp. Ex. J.

The patent reissue application requirements are set forth at 37 C.F.R. §§ 1.171 -1.179.

The Reissued Patent is attached to the parties' submissions as: Pl.'s SJ Ex. L and Defs.' SJ Ex. E.

The Consulting Agreement provided that all remuneration was to be paid to CSR. (Consulting Agreement § 3.) In practice, however, all bonuses/commissions appear to have been paid to Downey. (Defs.' SJ Exs. X, Y.)

The other two principles concerned proposals for revision of the CSR/Downey incentive bonus calculation, and for Downey to transition to vice president of DRI and relocate from Toronto to Lancaster, Pennsylvania. (Pl.'s SJ Ex. T.)

Specifically, in a January 1, 2011 email to Downey, Dodge stated: "The incentive compensation in place for 2007 was outlined in my letter to you dated 28 April 2007. The bonus comp is 12% of Business Unit operating profit." (Defs.' SJ Ex. W.) Downey's testimony is consistent with this letter, stating that at some point, he and Dodge agreed that the bonus compensation would be "12 percent of the net margin of the Sound and Vibration business." (Downey 8/29/16 Dep. 140.)

From early 2006 through mid-September 2012, Ecore was involved in other litigation involving, inter alia , the validity and enforceability of the '723 and Reissued Patents. See Dodge-Regupol, Inc. v. RB Rubber Prods., Inc. , No. 06-236 (M.D. Pa.); U.S. Rubber Recycling, Inc. v. ECORE Int'l Inc. , No. 09-9516 (C.D. Cal.); RB Rubber Prods., Inc. v. Ecore Int'l, Inc. , No. 11-319 (D. Or.).

Excerpts of John Freidkes August 26, 2016, deposition testimony are attached to the parties' submissions as: Pl.'s SJ Ex. V and Defs.' SJ Opp. Ex. 6.

Downey also filed a cross appeal asserting that even if he did receive valid consideration, the Confidentiality Agreement is unenforceable against him because he was never an employee of Ecore. (Ontario Ct. App. Op. ¶ 60.) The Ontario Court of Appeals rejected this argument, holding that the Confidentiality Agreement provision stating that the agreement was to apply "during and after" Downey's employment, "simply confirms that Downey's confidentiality obligations were to survive the termination of his relationship with Ecore." (Id. ¶ 61 (citing Confidentiality Agreement § 5).) The court noted that the relevant provision did "not provide that the Confidentiality Agreement or Downey's confidentiality covenants were to apply only if Downey was an employee ... or that his employment ... was a condition precedent to the triggering of those covenants." (Id. ¶ 62 (italics in original).)

On May 23, 2012, the parties entered into a settlement agreement resolving Ecore's claims for injunctive relief during the pendency of the Re-labeling Case. (Defs.' SJ Ex. CC.) At some point after the parties resolved the injunctive relief claims, Ecore separately reached a settlement with Dart, which was dismissed from the action by Order dated July 14, 2015. (Re-labeling Case, ECF No. 84.)

The July 2, 2015 Agreement is attached to the parties' submissions as: Defs.' SJ Ex. AA and Pl.'s SJ Opp. Ex. P.

Ecore filed an opposition to this Motion, asserting that it was untimely and that the litigation before this Court involved different parties and broader issues of fact and law than those involved in the Ontario Proceedings. (ECF No. 22.)

Despite the best efforts of Magistrate Judge Lloret, an amicable resolution of Case No. 11-6843 was not reached.

Also on June 15, 2016, we approved the parties' joint proposals, submitted at the Court's request, to bifurcate the parties' claims and counterclaims, and the litigation schedule, into two phases. (See Phase I Order, ECF No. 65; Phase II Order, ECF No. 66.) Phase I comprises: Plaintiff's Counts I through VI, and Count I in Case No. 16-1993; Defendants' Counterclaims I through XI; and the patent ownership issues of Counterclaim XIV. (Phase I Order.) Phase II consists of: Plaintiff's Count II in Case No. 16-1993; Defendants' Counterclaims XII and XIII; and the remaining issues of Counterclaim XIV. (Phase II Order.)

Defendants' Motion to Dismiss the claims alleged in Case No. 16-1993 and Ecore's Response in opposition thereto (ECF No. 80) were both filed and docketed in Case No. 11-6843.

As a preliminary matter, we note that the parties have not raised any choice of law issues with respect to the claims at issue in their motions, and their briefs clearly presume the application of Pennsylvania law. When a federal district court exercises supplemental jurisdiction over state law claims, it applies the substantive law of the forum state, including, if applicable, the forum state's choice-of-law rules. See Chin v. Chrysler LLC , 538 F.3d 272, 278 (3d Cir. 2008). However, where the parties agree on the substantive state law that applies, a court may assume, without deciding, that the agreed upon law applies. See USA Mach. Corp. v. CSC, Ltd. , 184 F.3d 257, 263 (3d Cir. 1999) ("Because the parties appear to be in agreement on [the choice-of-law] issue, we will assume, without deciding, that Pennsylvania law supplies the appropriate substantive rules."). Here, because the parties appear to agree on the application of Pennsylvania substantive law, that is the law we will apply.

The parties have not addressed the standard of proof Downey must satisfy, specifically, whether the existence of the alleged oral contract must be established by a preponderance of the evidence or by the more stringent standard requiring "clear and precise" evidence. See, e.g., Park v. Ahn , No. 15-678, 2018 WL 3031851, at *4-6 (W.D. Pa. Jun. 19, 2018) (collecting cases and discussing standard of proof necessary to show existence of oral contract); Fish Net, Inc. v. ProfitCenter Software, Inc. , No. 09-5466, 2013 WL 5635992, at *4 (E.D. Pa. Oct. 15, 2013) (same). The Pennsylvania Supreme Court has held that an "oral contract which modifies or changes or cancels a prior written contract must be proved by evidence which is clear, precise and convincing." Pellegrene v. Luther , 403 Pa. 212, 169 A.2d 298, 300 (1961) (citations omitted). However, in subsequent cases, courts have reasoned that proof by a preponderance of the evidence is sufficient to establish the existence of simple or garden variety oral contracts purporting to modify written contracts that are not integrated or do not represent the parties' entire contract.
"[A] written contract need not contain an express integration clause in order to be fully integrated. A written contract without an express integration clause can be considered fully integrated if it appears to reflect the parties' complete agreement." SodexoMAGIC, LLC v. Drexel Univ. , 333 F. Supp. 3d 426, 450, No. 16-5144, 2018 WL 3659241, at *14-15 (E.D. Pa. Aug. 2, 2018) (collecting cases). "To determine whether or not a writing is the parties' entire contract, the writing must be looked at and 'if it appears to be a contract complete within itself, couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the [parties'] engagement, it is conclusively presumed that [the writing represents] the whole engagement of the parties....' " Yocca v. Pittsburgh Steelers Sports, Inc. , 578 Pa. 479, 854 A.2d 425, 436 (2004) (quoting Gianni v. Russell & Co. , 281 Pa. 320, 126 A. 791, 792 (1924) ).
Here, it appears that the Confidentiality Agreement, construed together with the Consulting Agreement, represented the parties' entire contract at the time the agreements were executed. Thus, the "clear and precise" standard may well apply to Downey's oral contract claim. However, we need not finally resolve that issue because even under the preponderance standard, Downey cannot establish that the October 2001 "Agreement" existed or superseded the Confidentiality Agreement.

Under Pennsylvania law, the elements for collateral estoppel are satisfied when: "(1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment." Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n , 342 F.3d 242, 252 (3d Cir. 2003) (citation omitted).

As noted above, the time of performance is a "material and necessary" element of an enforceable contract, and the omission of this and other essential terms renders the alleged agreement "too indefinite for a party to reasonably believe that it could be enforceable in an action at law." Lackner , 892 A.2d at 30-32 ("[Defendant's] ... promise of royalties upon a possible sale of patents was ... [too] indefinite in terms of amount, time, place, or consideration ... to establish the elements of a contract regarding the assignments of the patents."); see also Quandry , 2009 WL 997041, at *12 ("The essential terms of a contract ... include the time and manner of performance and price or other consideration." (citations omitted) ).

Contrary to Defendants' argument, Downey's February 2011 filing of the Ontario Proceedings also did not toll the statute of limitations, which had long expired by that time. However, even if the Ontario Proceedings had been filed within the limitations period, it would not save Downey's untimely claim in this action because "Pennsylvania does not recognize 'cross-jurisdictional' tolling." Romero v. Allstate Ins. Co. , No. 01-3894, 2018 WL 2325405, at *5 n.28 (E.D. Pa. May 22, 2018) (citing Ravitch v. Pricewaterhouse , 793 A.2d 939, 942-43 (Pa. Super. 2002), appeal denied , 572 Pa. 758, 818 A.2d 505 (2003) ); see also Atlantic Pier Assocs., LLC v. Boardakan Rest. Partners, L.P. , Nos. 08-4564, 09-1619, 2011 WL 3268129, at *6 (E.D. Pa. Jul. 29, 2011) (collecting cases).

Because Downey first filed his breach of contract counterclaim on October 11, 2012, the claim is untimely if he knew or should have known of its existence more than four years prior to that date.

Indeed, in his June 29, 2011 letter to Dodge, Downey expressly referred to his "10-year-old claim for compensation from our agreement on the reissued patent." (See Pl.'s SJ Ex. U; Defs.' SJ Ex. O.)

We note that in its Reply brief, Ecore states that it "does not dispute the validity of the Consulting Agreement." (Ecore SJ Reply 35.) To the extent Ecore disputes that the 12 percent bonus formula applied beginning in 2007, its position is refuted by its own documents and Downey's uncontroverted deposition testimony. (See Defs.' SJ Ex. W, X; Downey 8/29/16 Dep. 140; see also Dodge 8/22/16 Dep. 70 (testifying that January 2, 2002, email confirmed a bonus structure of "6 percent of gross margin ... for fiscal years 2002 through 2004. " (emphasis added) ).

Under Pennsylvania law, fraud claims are generally subject to a two-year statute of limitations. 42 Pa. Cons. Stat. Ann. § 5524(7). Since we have already determined that Downey's contract-based claims are barred by the four-year limitations period applicable to those claims, we will not repeat that analysis with respect to his fraud claims founded on the same factual allegations.

Excerpts of Downey's August 30, 2016 deposition testimony are attached to the parties' submissions as: Pl.'s SJ Ex. R, Defs.' SJ Ex. II, Pl.'s SJ Opp. Ex. L, and Defs.' SJ Opp. Ex. 17.

According to Defendants, these companies are: Sound Isolation Store, Marjam Supply Company, Dal Tile, Century Tile, Aura Seaside, Boca Lofts, Broadstone Harbor Beach, CAC Development, Circle Floors, Direct Flooring, JJ Haines/Ram Flooring, Jacobsen Construction, Met Lumber, and Via Mizner.

In opposition to Ecore's Motion, Defendants cite to Downey's deposition testimony and a collection of exhibits consisting primarily of emails between Pliteq or Ecore personnel and various individuals whose company affiliations and relationships to the parties are often unclear and unexplained. We also note that although Defendants' opposition recites the elements of a claim for tortious interference, it contains virtually no discussion of how the evidence in this case establishes the elements of Pliteq's claim.

Notwithstanding this assertion, Downey testified in 2016 that Pliteq was still doing business with Sound Isolation Store at that time. (Downey 8/30/16 Dep. 110, Defs.' SJ Opp. Ex. 17.)

We note that the evidence cited by Defendants includes hearsay statements that may or may not be capable of admission at trial. "[W]hile the Court is able to consider testimony presented as hearsay on a motion for summary judgment-for example, testimony via affidavit and deposition-it must be possible for the underlying testimony to be presented in an admissible form at trial." Washington-Pope v. City of Philadelphia , No. 12-4300, 2015 WL 7450522, at *2 (E.D. Pa. Nov. 24, 2015) (citing Escanio v. United Parcel Serv. , 538 F. App'x. 195, 201 (3d Cir. 2013) ). Because Defendants' evidence is insufficient to establish a genuine issue for trial as to Ecore's alleged tortious interference, we will not further analyze the potential admissibility of that evidence.

Ecore also alleges that Downey retained documents protected by the attorney-client privilege, including an email between Ecore and its counsel that Downey attached to his original counterclaims. Downey counters that the subject email was also produced by Ecore, and that neither Ecore nor Pliteq produced the document with any attorney-client privilege redactions but, instead, designated it as confidential under the Protective Order.